THE CHESAPEAKE AND OHIO RAILWAY COMPANY AND
AFFILIATED COMPANIES, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

THE CHESAPEAKE AND OHIO RAILWAY COMPANY AND
SUBSIDIARY CORPORATIONS, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 5904-70, 5646-71.     Filed June 2, 1975.

*James P. Holden, Paul F. Mickey, Richard E. May, John W. Tissue, Robert S. Garnett,* and *Kenneth Ekin,* for the petitioners. *St. Clair Reeves,* for the respondent.

RAUM, *Judge:* The Commissioner determined deficiencies in petitioner's[1] Federal corporate income taxes for the years 1954 through 1963, and petitioner, by its original and amended petitions, has claimed overpayments in each of those years with the exception of 1963. The respective amounts of the determined deficiencies and the claimed overpayments are as follows:

| Docket No. | Calendar year | Deficiency | Overpayment (per amended petitions) |
|---|---|---|---|
| 5904-70 | 1954 | $1,316,049.31 | $4,510,178.49 |
| | 1955 | 5,861,634.16 | 2,281,363.35 |
| | 1956 | 2,368,983.46 | 5,622,512.30 |
| | 1957 | 789,708.90 | 4,561,570.11 |
| | 1958 | 4,315,981.24 | 3,809,908.98 |
| | 1959 | 2,879,966.21 | 2,733,258.60 |
| | 1960 | 2,851,642.52 | 2,889,725.58 |
| | 1961 | 2,119,317.33 | 73,080.33 |
| 5646-71 | 1962 | 2,830,011.00 | 604,546.00 |
| | 1963 | 3,817,305.00 | --- |

The cases were consolidated for trial. Prior to trial the parties reached agreement on all but the following issues:

(1) Whether under the so-called retirement-replacement-betterment method of depreciation accounting, by which petitioner determines deductions in respect of its investment in track structure, petitioner is entitled to a ratable depreciation allowance on account of anticipated retirement, and if so,

---

[1] The petitioners in this case are the Chesapeake & Ohio Railway Co. and its 14 subsidiary corporations, all members of an affiliated group. For ease of reference, the entire group will be referred to herein as the Chesapeake & Ohio Railway Co. (C & O) or simply as "petitioner."

whether petitioner has established the useful life of its track structure based upon obsolescence foreseeable in 1954.

(2) Whether petitioner's investments in grading and tunnel bores had, as a result of obsolescence foreseeable in 1954, reasonably determinable useful lives such as to entitle petitioner to depreciation deductions on account thereof, and if so, what were their useful lives.

(3) For purposes of determining the proper depreciation allowance under the retirement-replacement-betterment method of accounting in respect of its rail investment, what was the fair market value of petitioner's recovered reusable rail.

GENERAL FINDINGS OF FACT

The parties have filed a stipulation of facts and four supplemental stipulations which, together with their accompanying exhibits, are by this reference incorporated herein.

Petitioner, the Chesapeake & Ohio Railway Co., a Virginia corporation, maintained its principal place of business in Cleveland, Ohio, at the times of filing its petitions herein. For each of the taxable years in issue, petitioner filed Federal consolidated corporate income tax returns with the District Director of Internal Revenue at Cleveland, Ohio.

The Chesapeake & Ohio Railway Co. is a Class I rail carrier, regulated by the Interstate Commerce Commission. Petitioner carries freight in a 7-State area extending from Virginia to Michigan as well as in a small portion of Canada. More precisely, in 1954 its main line stretched westwardly from Newport News, Va., to Huntington, W. Va., from which point separate lines proceeded westwardly to Lexington, Ky., northwestwardly to Chicago via Cincinnati, and northwardly into Michigan and Canada. At that time petitioner either owned or operated approximately 3,400 miles of main line. In addition to its main line, petitioner also had in service about 1,700 miles of so-called "branch line," which refers to those portions of its track which were constructed in order to provide a link from a particular area, typically a coal mine, to the main line.

## Issue 1. Depreciation of Track Structure

### FINDINGS OF FACT[2]

As in the case of other eastern railroads of the United States, almost all of petitioner's rail mileage existing in 1954 was built in the latter part of the 19th century. In contrast to sophisticated techniques and equipment now available, earthmoving and excavation techniques during the era when these railroads were constructed involved mainly human labor, assisted by picks, dynamite, and horse-drawn wagons. As a consequence of these limitations, the builders of railroads sought "water level routes" along rivers and preferred natural contour paths around hills and mountains, both of which required a minimum of excavation. The disadvantage of this type of construction was reflected in the completed roadbed's pronounced curvature and steep grades. Thus, major portions of railroad line owned by petitioner in 1954 followed the James River and the New River while other parts passed over hilly and mountainous terrain. Accordingly, petitioner's roadbed is characterized by heavy curvature and steep grades.

Both the curvature and grade of the roadbed bear directly upon the economical operation of a railroad. Curves restrict the maximum safe speed at which a train can travel. Curvature is expressed in degrees which are correlated to the radius of a circle, the arc of which matches the curve in the roadbed. Thus, for example, a 1-degree curve fits the arc produced by a 5,730-foot radius while a 4-degree curve relates to a radius one-fourth that length and a ½-degree curve to a radius twice that length. The maximum safe speed on a ½-degree curve is 100 miles per hour, whereas on a 6-degree curve it is only 45 miles an hour. Thirty percent of the roadbed on petitioner's main lines is curved in excess of 1 degree, and the maximum curve in various sectors ranges as high as 8 degrees. As an example, on the James River main line route from Newport News to Chicago, 52 percent of the track is curved in excess of 1 degree and the maximum curve is 8 degrees.

---

[2] Some of the findings set forth here are relevant to all three issues and some to issues 1 and 2. Although to a considerable extent many of the latter have only marginal relevance to issue 1 in the light of our disposition of this issue, it is convenient to include them at this point. In general, the findings relating exclusively to issue 2 or 3 will be set forth separately under each of those issues, respectively.

Grades result in higher operating costs. Grade is expressed as the ratio of vertical climb to horizontal distance. For instance, a 1-percent grade has a 1-foot climb for every 100 feet of horizontal distance; a 3-percent grade has 3 feet of climb per 100 feet of horizontal distance. To operate a train on a 1-percent grade for a mile requires more than 7 times the locomotive force necessary to run it for a mile at the same speed on a level track. Grades on major portions of petitioner's main lines run as high as 2.6 percent, and on branch lines in excess of 3 percent.

As of 1954, the first of the years here in issue, the economic outlook for a period of about the next three decades for the railroad industry in general and petitioner in particular was discouraging. It was predictable that there would be a period of contraction, extending probably into the mid-1980's, which would be characterized by a continuing decline in the share of intercity freight traffic carried by railroads. The major contributing factors to this bleak assessment were the increasing urbanization of the country and the growth of competition from other forms of transportation. Many parts of petitioner's and other railroads' route structures, which had been built to serve the needs of the prior century, no longer met modern transportation needs. By 1954, the economic logic of a sprawling, weblike track configuration, designed to serve primarily agricultural and mining customers, had been superseded by the preeminence of manufacturing and its attendant urban concentration. In 1954, 20 percent of the rail lines in the United States carried 64 percent of railway traffic, while 40 percent carried only 5 percent of such traffic. In the case of petitioner, the elimination of some 2,000 miles of lines would reduce its gross ton-miles of freight by only 5 percent. The uneconomic imbalance of an overextended plant, the underutilized parts of which were unlikely to recover their former usefulness, made the prospect of abandonments of substantial portions of their lines very desirable among the railroads in 1954. It could thus be reasonably anticipated that this period of contraction extending into the mid-1980's would result in a leaner, more economical route structure.

At the same time, the railroad industry as a whole was suffering inroads into its theretofore predominant position in respect of intercity freight traffic. Despite the growth between 1946 and 1954 in the total market for intercity freight traffic,

not only had the railroads' relative share dropped from 66.6 percent to 49.5 percent, the absolute volume of traffic carried by rail had also declined. During that period other means of transportation, including waterways, pipelines, and most noticeably trucking, gained business at the railroads' expense. This phenomenon was traceable primarily to the expansion with public funds of the nation's highway and waterway systems. Foremost among such programs was the new 41,000-mile interstate highway system. The prospect of continued competition, particularly the promise of an extensive new highway system, made it evident to some in 1954 that the railroads' relative position in respect of total intercity freight traffic would continue to wane for some time, thereby intensifying the need to abandon the outlying and economically obsolete lines in an effort to produce a leaner physical plant.

In spite of the bleak prospect in 1954 of the difficulties facing the railroads for the next three decades or so, the longer term prognosis could have been regarded, and was in fact regarded by some, as favorable. The decline in the railroads' share of the intercity freight traffic from 1946 to 1954, and the anticipated decline thereafter, was attributable mainly to the new, federally-financed alternative modes of transportation, not to an absolute decline in overall intercity freight movement. On the basis of the historically close correlation between the country's gross national product and the gross ton-miles of intercity freight transportation, it could have been plausibly anticipated that with the growth of the gross national product there would occur comparable increases in total intercity freight. At the same time it was unlikely that the railroads' share of the traffic would drop below 40 percent on account of the ever-present bulk commodities such as wheat, sand, gravel, iron ore, coal, building supplies, and lumber which generally comprise about a third of the market. Thus, even if the railroads' market share remained at 40 percent, by reason of the expected ever-increasing market, the absolute volume of traffic moving by rail could also be expected to increase by perhaps as much as 3 or 4 times the 1954 level.

There was also some question in 1954 whether other modes, particularly trucks, could continue to increase their capacity at the same rate as that of intercity freight traffic growth. Both fuel efficiency and land use policy could be expected to place considerable constraints upon the indefinite expansion of the

trucking industry. As these and other considerations would begin to restrain truck and highway expansion, the railroads' inherent economies of scale could, with sufficient volume, have been expected to appear quite favorable. From these factors one might have concluded in 1954 that the railroads' market share would in fact ultimately begin to rise from the 40-percent level, thereby accelerating the increase in the railroads' absolute volume of intercity freight traffic. Thus, it could be plausibly anticipated in 1954 that, notwithstanding the probable decline in the relative importance of railroads during the ensuing period of about 30 years, the railroad industry as a whole would ultimately enjoy substantially increased demand for its services within this century.

In order to meet the predictable increases in the volume of rail freight, it was also foreseeable in 1954 that major changes would be required in the railroad plant. It was anticipated that the expected increases in traffic would occur largely on the main, high-density, intercity lines. Moreover, those branch lines which would not participate in the projected traffic increases would be abandoned. However, petitioner's roadway, as it existed in 1954, could not accommodate unlimited increases in traffic. Although it could be reasonably expected to absorb about 3 times the amount of traffic carried in 1954 without any major modification of its lines, it was reasonably predictable in 1954 that, beginning in the mid-1980's and extending perhaps into the next century, petitioner would undertake to upgrade its plant in accordance with the demands of the even heavier traffic loads expected. Aside from rebuilding its yards and introducing more efficient rolling stock, this modernization would entail reconstruction of about half of its main line system in order to realign and reduce both the curvature and the grades. And in this connection such modernization could well entail substantial modifications of its "track structure" (defined in the following paragraph), for example, by substituting concrete ties for wooden ties. But the possibility of replacing the entire track structure with so-called concrete slab (described hereinafter) was not reasonably in contemplation during the tax years.

The term "track structure" collectively refers to those assets maintained in the following five property accounts prescribed by the Interstate Commerce Commission Uniform System of Accounts for Railroad Companies (49 C.F.R. sec. 1201):

| Account | Property | Account | Property |
|---|---|---|---|
| 8 _____ | Ties | 11 _____ | Ballast |
| 9 _____ | Rails | 12 _____ | Track laying and |
| 10_____ | Other track material | | surfacing |

Together these assets comprise the physical structure, exclusive of the land, which supports and guides petitioner's trains. In general, these assets fulfill the following functions: Ties are the cross pieces, usually wooden, which directly support and hold the rail on which the trains roll; other track material refers to the variety of miscellaneous metal components, such as rail joints, bolts, tie plates, spikes, and switches, which are used to secure the rails to one another and to the ties as well as for other special purposes; ballast is the crushed rock, gravel, or other granular material which forms a suitable foundation for the ties; and track laying and surfacing refers to the labor expense of installing all of the above. Generally speaking, track structure may be retired not only on account of physical exhaustion from use but also due to obsolescence stemming from technological advances or the abandonment of a particular line.

In addition to the need to realign certain segments of petitioner's track, it was understood in the early 1950's that, in anticipation of the increase in traffic beyond its capacity, a more stable form of track structure would ultimately be required to accommodate the expected heavier traffic loads and the accompanying maintenance problems for conventional track. In 1954, the new developments in railroad track technology were the reinforced concrete tie (as opposed to wooden ties) and the continuous welded rail (as opposed to the conventional rail, which is jointed together by bolts and bars in 39-foot lengths). The significance of these lay in their promise to reduce track maintenance costs and time, both of which could be expected to rise as traffic grew. Petitioner subsequently began to lay welded rail in 1959 but to date has used only about 182 concrete ties in one test site. Of vastly greater potential insofar as more durable track structure is concerned was the development of so-called slab track. Slab track does not utilize ties or ballast. Rather, the rails are supported on solid, reinforced concrete slabs, which themselves rest upon a specially prepared roadbed. However, in 1954, the only slab track in use was the relatively primitive form of stub-ties embedded in concrete in stations and subways. Not until the 1960's did the technology of slab support advance materially,

primarily in other countries, and it is doubtful that in 1954 petitioner foresaw that virtually its entire main line might be rebuilt incorporating slab track, as now appears plausible at some future date provided that the costs would not be prohibitive and that the large amount of funds necessary in any event for that purpose could somehow or other be obtained.

For purposes of Federal income taxes, petitioner accounts for its investment in track structure under a system of depreciation accounting known as the retirement-replacement-betterment method. This system of accounting is sometimes referred to simply as the retirement method or the RRB method. Under this method, petitioner capitalizes the initial cost of its track structure. No ratable deduction is allowed during the life of each of the original assets; however, upon the replacement or retirement of the asset a "depreciation" deduction is allowed. In the event of retirement without replacement, the deduction is equal to the cost of the asset, less its salvage value, plus the cost of its removal. If an asset is replaced with one of like quality, the capital account is left undisturbed and the deduction consists of an amount equal to the cost of the replacement (including associated labor cost) less the salvage value of the retired asset; in the case of a replacement of better quality than the original asset, the cost attributable to the betterment in quality is added to the capital account while the cost of the replacement component is an allowable deduction. Thus the annual depreciation deduction under the RRB method consists of two elements: (1) The cost of replacements including the replacement component of betterments (plus labor cost and less salvage value), and (2) the cost of retirements without replacement (plus labor cost and less salvage value).

In its petitions, petitioner has claimed an overpayment of its Federal income taxes for each of the years here in issue in respect of the depreciation deductions to which it is entitled on account of its track structure. In addition to those amounts allowed under the RRB method as described above, petitioner has computed additional amounts claimed to be allowable under the RRB method by, first, alleging that its track structure will be retired without replacement within approximately 50 years from 1954, and second, upon that basis calculating ratable annual depreciation deductions which would properly anticipate the retirement of its entire investment in track structure by the year 2004.

Petitioner has not requested nor has the Commissioner granted his consent to any change in petitioner's method of accounting for its track structure. The Commissioner, in his answers, denied both that it was reasonably foreseeable that petitioner's track structure would become obsolete within 50 years and that petitioner was entitled to depreciation allowances on account of such obsolescence.

OPINION

At issue here is whether the retirement-replacement-betterment method of depreciation accounting permits ratable annual deductions in anticipation of the alleged foreseeable retirement of property. More particularly, it is petitioner's contention that, first, it has shown that in 1954 it was foreseeable that its track structure would become obsolete within 50 years, and second, that unless it is permitted to anticipate such extraordinary retirements through annual ratable deductions of its investment in track structure its income will be grossly distorted due to the relatively slender span of years in which such massive retirements will occur. This, petitioner points out, involves a change only in the timing and not in the method of recapturing its track structure investment, and is an adjustment which is required in order to more clearly reflect its income.

The Commissioner responds that the RRB method does not permit any ratable annual deduction in anticipation of retirement. Petitioner's claimed deductions therefore constitute an attempt to change its method of accounting, permission for which petitioner has failed to request and which the Commissioner has not granted as required by section 446, I.R.C. 1954. Moreover, the Commissioner denies that petitioner has adequately proved the useful life of its track structure.

The parties' dispute as to the proper operation of the RRB method is a narrow one. Petitioner admits that under the present circumstances it is not entitled to change its method of accounting from the RRB method,[3] while the Commissioner does not deny that methods other than RRB may also clearly reflect

[3] We do not understand petitioner to contend that if ratable deductions in anticipation of retirement are inconsistent with the RRB method, then the RRB method as such is invalid inasmuch as it does not then permit a "reasonable allowance" as authorized by sec. 167(a). Nor could such an argument prevail. *Chicago & N. W. Ry. Co. v. Commissioner*, 114 F. 2d 882, 885, 887 (7th Cir.), affirming 39 B.T.A. 661, certiorari denied 312 U.S. 692.

petitioner's income. The sole question in this regard is whether *under the RRB method* petitioner may take a depreciation deduction on a straight-line basis in respect of its entire track structure on the assumption that it will all become obsolete in 50 years. We hold that it may not.

At the outset, it should be borne clearly in mind that petitioner's track structure is a depreciable asset in respect of which it is entitled to deductions under section 167(a)(1),[4] which provides that there "shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)" in respect of certain business property. Under section 167(b) the taxpayer is authorized to compute such "reasonable allowance" in accordance with one of the enumerated depreciation methods or "any other consistent method productive of an annual allowance" which does not exceed certain limits not here relevant.[5] It was in this context that petitioner *chose* to depreciate its track structure under the RRB method. It could have selected the straight-line method. It did not, and there is no question that in order to shift from one method to another, it must first obtain the permission of the Commissioner, which it has also not done. Sec. 446(e); secs. 1.167(e)-1(a), 1.446-1(e)(2)(i), Income Tax Regs.; *Chicago & N.W.R. Co. v. Commissioner,* 114 F. 2d 882, 887 (7th Cir.), affirming 39 B.T.A. 661, certiorari denied 312 U.S. 692; *Woodward Iron Co. v. United States,* 396 F. 2d 552, 554 (5th Cir.); *Arthur L. Kniffen,* 39 T.C. 553, 566.

In order to escape the unsatisfactory consequences of this conclusion, petitioner contends that ratable deductions in anticipation of the obsolescence of its track structure are compatible with the RRB method, indeed required by the RRB method, and they therefore do not constitute a change in its method of accounting requiring the prior consent of the Commissioner. This position we deem to be unsound.

The RRB method of accounting is simply one of several answers to the problem of systematically quantifying the yearly cost incurred in the use of business property. As the court in

---

[4] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, * * *

[5] See Rev. Rul. 73-135, 1973-1 C.B. 80.

*Commissioner v. Union Pac. R. Co.*, 188 F. 2d 950, 951 (2d Cir.), recognized—

Theoretically, the ideal way to compute the depreciation of a road's "ways and structures" would be to appraise the value of each item at the beginning and at the end of its fiscal year, and to subtract the difference. That would be a practical impossibility, and no one suggests its propriety. Another way would be to estimate the life of each item and assume that in every year its depreciation was the same—"Straight Line Depreciation." While this might not be accurate for any single item, differences would be cancelled out, when there were a great many. It would also be possible to group together a number of similar items, to assume that each had the same longevity, and to make a collective proportional deduction for all. "Retirement Accounting" was an alternative: it made no deduction for the depreciation of any item, or group of items, until it, or they, were abandoned; and then it credited to depreciation the original cost, plus additions chargeable to capital, deducting any salvage. Thus, in any year the road got no credit for actual depreciation during that year upon any but abandoned items; but in its stead it got a cumulative credit made up of all past depreciations of abandoned items. The assumption was that the aggregate of actual annual depreciations upon items not abandoned, which the road did not deduct, would, if the system lasted long enough, match the aggregate of the original costs and capital increments of all abandoned items. If the number of items was great enough, the result in the case of a stable system was probably about the same under this method as under "Straight Line Depreciation."

The essence of the RRB method is that depreciation deductions in respect of capital additions are deferred until the property is retired without replacement, and that, meanwhile, replacements are deducted currently in full when made as though they were expenses instead of being capitalized. Whereas straight-line depreciation involves ratable deductions over the life of the asset (*Boston & M.R.R. v. Commissioner*, 206 F. 2d 617, 619 (1st Cir.))—

Under the retirement system of accounting, however, there are no annual depreciation charges as such, and hence no annual adjustments are made in the book values of the various assets. Only upon the ultimate retirement or replacement with betterments of any particular item of property or equipment is any change made in the investment account; and on that occasion, the full initial book value of the asset (i.e., usually the original cost) is taken out of the capital account, and this sum, diminished by the net salvage proceeds, is then charged to current expense (or in certain cases directly to profit or loss). Meanwhile, any repairs or minor replacements made during the life of the property are charged directly to current expense and are never reflected in the capital account.[1] [Fn. omitted.]

It is readily apparent that the mechanics of the RRB method may conceivably create very large distortions in the railroad's

income—distortions in the sense that the deductions generated in a particular year by unusually large retirements or replacements can be wholly disproportionate to the amount of actual depreciation sustained in that year. Yet, this is the method which petitioner chose to use, a method which may operate to give the railroads very substantial benefits (cf., e.g., Rev. Rul. 73-135, 1973-1 C.B. 80) and which both petitioner and the railroad industry have strongly defended and sought to preserve. See Hearings on Railroad Accounting Procedures Before the Subcomm. on Legal and Monetary Affairs of the House Comm. on Government Operations, 85th Cong., 1st Sess. 100, 124 (1957). This method has been adopted throughout the railroad industry as provided by the ICC Uniform System of Accounts for Railroad Companies, 49 C.F.R. part 1200 et seq., and the Commissioner has approved its use for purposes of Federal income tax accounting. See Rev. Rul. 67-22, 1967-1 C.B. 52. It is a method with which Congress is familiar, and, notwithstanding its obvious potential for distortion of income in a particular year, it must be assumed that the method is regarded by Congress as authorized by section 167 and predecessor provisions of the tax laws. See, for example, S. Rept. No. 1983, 85th Cong., 2d Sess. 107-110 (1958). See also sec. 48(a)(9), I.R.C. 1954, added by the Revenue Act of 1971, Pub. L. 92-178, sec. 104(g), 85 Stat. 497, 502-503; S. Rept. No. 92-437, 92d Cong., 1st Sess. 33-34.

This near unanimous recognition and acceptance of the RRB system is further reflected in its repeated application by the courts. *Boston & M.R.R. v. Commissioner, supra; Commissioner v. Union Pac. R. Co., supra; St. Paul Union Depot Co. v. Commissioner,* 123 F. 2d 235 (8th Cir.); *Chicago & N.W.R. Co. v. Commissioner, supra; Southern Ry. Co. v. Commissioner,* 74 F. 2d 887 (4th Cir.), affirming and reversing 27 B.T.A. 673; *Chicago & North Western Railway Co.,* 29 T.C. 989; *Akron, Canton & Youngstown Railroad Co.,* 22 T.C. 648, remanded on another issue 56-1 USTC par. 9282; *Central Railroad Co. of New Jersey,* 35 B.T.A. 501. The ultimate justification of its use is that, through the aggregate yearly deductions stemming from the annual retirements, replacements, and maintenance, the railroads will, in the course of an established and on-going business, recoup their capital investment, and that is the rough equivalent of depreciation. It is, as the court in *Boston & M.R.R. v. Commissioner, supra,* stated (206 F. 2d at 619):

important to note immediately that the final charge to expense upon the retirement of a piece of equipment is not to be understood as an effort to make up for the failure to take any prior yearly "depreciation" on this particular item during its useful life. Rather the underlying theory of the retirement method is that the charges to expense on account of all the items retired or replaced in any particular year are taken as a rough equivalent of what would be a proper depreciation allowance for *all* the working assets of the company for that year. The assumption is that once the system is functioning normally and the retirements are staggered fairly regularly, the charges to expense on account of equipment wearing out or otherwise disappearing from service are spread out and stabilized, and hence will approximate the results under straight-line depreciation. At the same time it is thought that this method will eliminate the not inconsiderable bookkeeping problem of making annual depreciation adjustments on account of each and every asset owned by an extensive railroad. Thus, under both methods, the total charges to expense on account of any particular asset—to the extent that such a segregated concept makes any sense at all under the averaging approach of the retirement system—are the same; also, if the retirements occur fairly regularly, the total annual charge on account of equipment becoming unserviceable should eventually tend to become roughly equivalent under both methods. However, under the retirement system the total capital account (i.e., the book value of the assets) is always higher, since under that system no adjustments are made in this account until an item is actually retired.

See also *Chicago & N.W. R. Co. v. Commissioner,* 114 F. 2d at 886; *Southern Ry. Co. v. Commissioner,* 74 F. 2d at 890.

Although the results are necessarily imprecise, neither do the alternative ratable methods, the accuracy of which depends upon prior and inexact estimates of useful lives, conform to the actual truth of depreciation. *Commissioner v. Union Pac. R. Co.,* 188 F. 2d at 951. Indeed, though the RRB method requires the deferral of annual depreciation deductions in respect of capitalized property until retirement, the countervailing effect of immediately charging all replacement and maintenance costs to expense instead of to capital makes it impossible to say which method of depreciation accounting best conforms to the reality of depreciation. *Commissioner v. Union Pac. R. Co.,* 188 F. 2d at 951; *Southern Ry. Co. v. Commissioner,* 74 F. 2d at 890. The import of this rationale for our purposes lies in the fact that under RRB the permissible allowance for the full cost of property retired is *not* an adjustment for that property's unaccounted past depreciation; rather, it is an indirect measure of the system's overall actual depreciation undergone during the accounting period in which its retirement occurred. *Commissioner v. Union*

*Pac. R. Co.,* 188 F. 2d at 952. It is, as the court stated in *Boston &
M.R.R. v. Commissioner,* 206 F. 2d 617, 622 (1st Cir.), "the
essence of retirement accounting * * * that the ledger value of an
asset is charged off *only* when that item is retired." (Emphasis
supplied.) Thus any depreciation allowance in advance of actual
retirement does serious violence to the theory upon which the
RRB method is predicated resulting in the understatement of the
capital account and correspondingly excessive deductions.
*Chicago & North Western Railway Co.,* 29 T.C. at 1002; *Akron,
Canton & Youngstown Railroad Co.,* 22 T.C. at 654. This was
also the understanding of the courts in *St. Paul Union Depot Co.
v. Commissioner,* 123 F. 2d at 237; *Chicago & N.W.R. Co. v.
Commissioner,* 114 F. 2d at 886; *Central Railroad Co. of New
Jersey,* 35 B.T.A. at 503; but cf. *Cincinnati Union Terminal Co.,*
44 B.T.A. 905, 911-912, and so do we now understand it.

Against this background, it is clear that the introduction of
ratable depreciation to supplement RRB deductions, merely on
account of alleged foreseeable obsolescence 50 years hence, is not
compatible with the RRB method. It is a change in that method
for which petitioner has not obtained the Commissioner's
permission. Although none of the cases cited above dealt with
precisely the issue before us, the similarities are compelling. For
example, in both *Central Railroad Co.* and *Chicago N.W.R. Co.*
the railroad companies, having used retirement accounting in the
past, sought to calculate future depreciation by the straight-line
method. In each case the court decided that since the retirement
method clearly reflected the petitioner's income, the use of
straight-line accounting constituted a change of accounting
methods without the necessary permission of the Commissioner.
The explicit and unambiguous premise in each instance was that
ratable deductions constituted a departure from and were
altogether incompatible with the retirement method. Of even
greater bearing here was the decision in *St. Paul Union Depot Co.*
in which the petitioner claimed ratable depreciation deductions
in respect of its railroad depot which had theretofore been
treated under the retirement method. It was found that the
depot, built between 1917 and 1925, had by 1935 become sub-
stantially obsolete. Because the depot constituted a third of all
the depreciable property owned by the petitioner, it argued that
to deduct its full cost in the year of the depot's actual retirement
would grossly distort its income, on account of which the

petitioner reasoned that it was entitled to deduct ratably the cost of the depot over its remaining useful life. The court squarely rejected the taxpayer's position, and in so doing addressed itself to the fallacy of the petitioner's argument (123 F. 2d at 239):

To argue that the retirement method of accounting which the petitioner has used does not clearly reflect its income, because that method will require it to charge off in one year the cost of one-third of its entire depreciable property, is to argue that the petitioner should be permitted to change its method of accounting for tax purposes.

It is abundantly clear here that petitioner's claimed depreciation in anticipation of the retirement of its track structure is incompatible with the RRB method under which it presently maintains the pertinent accounts. This conclusion is not altered by the possibility that petitioner's chosen method of accounting may result in unusually large retirement deductions in certain years. See Rev. Rul. 73-135, 1973-1 C.B. 80. That such so-called distortions may occur is inherent in the RRB method of depreciation. What petitioner thus proposes would in fact alter its intended operation. In the case of petitioner's long-range predictions of obsolescence, such an adjustment could conceivably entitle petitioner to deduct ratable allowances in anticipation of retirement, as well as RRB allowances, from the very first year an asset is placed in service. That, it can be seen, is the equivalent of pure straight-line depreciation *plus* RRB depreciation. True, the effect is one of timing and not of overall amounts. But it is equally true that timing is the critical difference between the two methods, a difference which petitioner asks us to ignore. This we are unwilling to do.

Petitioner has directed our attention to Bulletin F, issued by the Bureau of Internal Revenue in 1942, which alludes to the problem of income distortion under the retirement method due to unusually large retirements in "some years." It states that (p. 5):

This distortion can be avoided to some extent by anticipating the retirement of such units when the year of retirement can be predicted with reasonable accuracy and spreading the cost or other basis less estimated salvage over the estimated remaining useful life.

Putting to one side the introductory black letter cautionary notice by which the Commissioner disclaimed the authorita-

tiveness of Bulletin F's contents,[6] the record here fails to establish that petitioner has satisfied the conditions under which Bulletin F contemplates ratable deductions in anticipation of retirement. That portion of Bulletin F is concerned with an extreme situation where it is anticipated that disproportionately large retirements will occur within a very short period resulting in a pronounced distortion of income for that year or period. We are wholly unconvinced on this record that any such extraordinary distortion will occur. Petitioner has no definitive plans, even at this time, to say nothing of 1954, to retire its entire track structure through either abandonment or replacement with slab track or other improvements. As far as this record is concerned, if and when petitioner undertakes any such replacement program, it is one that could conceivably extend over a fairly long period, say 10, 15, 20, or more years, thus spreading the retirements over a period far longer than that contemplated by Bulletin F. Cf. Rev. Rul. 73-135, 1973-1 C.B. 80. Moreover, to the extent that petitioner might decide to replace less than all of its existing track structure, the threat of resultant distortions of the sort alluded to in Bulletin F is diminished. Thus, the claimed deductions in respect of track structure must be disallowed not only because they would effect 'a change in petitioner's accounting method for which it has not obtained the Commissioner's prior consent, but also because petitioner has failed to demonstrate the likelihood of income distortion, beyond that necessarily contemplated by the RRB system, which might justify the application of the exceptional remedy suggested in Bulletin F.

We are far from persuaded on this record that petitioner's track structure in its entirety will be retired in 50 years. However, we need not decide this question since we resolve the issue on the basis of the accounting method employed by petitioner. Under that method it is entitled to "depreciation"

---

[6] On its very first page Bulletin F states expressly in black letter that it is intended only as an "indication of Bureau practice and the trend and tendency of official opinion," and that it "does not have the force and effect of a Treasury Decision and does not commit the Department to any interpretation of the law which has not been formally approved and promulgated by the Secretary of the Treasury." The effectiveness of such disclaimer, which in substance also appeared in the Cumulative Bulletins has been recognized elsewhere. Cf. *Bartels v. Birmingham,* 332 U.S. 126, 132; *Helvering v. N.Y. Trust Co.,* 292 U.S. 455, 468; *Fruehauf Corp. v. United States,* 477 F. 2d 568, 572 (Ct. Cl.); *Commissioner v. Stone's Estate,* 210 F. 2d 33, 35 (3d Cir.); *Andrew A. Sandor,* 62 T.C. 469, 481-482.

deductions upon replacements and retirements, and nothing more.

## Issue 2. Depreciation of Grading and Tunnel Bores

### FINDINGS OF FACT

Before petitioner can construct its track on land which it has acquired for that purpose, it must prepare the ground surface to form a suitable roadbed. Grading, the process by which this is done, entails clearing the land and then smoothing and shaping it to support the track structure. In places, the grading may include excavations to divert streams or embankments to elevate the track above ground level. In mountainous areas it is very often necessary to cut away earth from the side of a hill just above the planned roadbed and to deposit the earth just below the roadbed thereby creating a level path of sufficient width. The cost of grading varies considerably depending upon the type of terrain being traversed and the acceptable degree of curvature and inclination for the roadway. Petitioner accounts for its investment in grading in Property Account 3, as prescribed by the ICC Uniform System of Accounts. Account 3 does not include the cost of obtaining the land.

Where it is too expensive or impracticable to build the roadway over a mountain or to excavate a cut through it, petitioner may create a path by boring through the mountain, that is, by digging a tunnel. Although, like grading, this too entails moving earth or rock to create a path, its cost, as well as the associated costs of lining, ventilating, and lighting the tunnel, when necessary, are carried in ICC Account 5.

With proper maintenance neither grading nor tunnel bores (apart from tunnel linings, ventilating and lighting systems, retaining walls, etc.) have any determinable physical lives, and neither grading nor tunnel bores have any salvage value upon retirement.

Although the Commissioner has allowed depreciation deductions in respect of such items as tunnel linings, ventilating and lighting systems, retaining walls, etc., which are included in Accounts 3 and 5 and which have determinable physical lives, he has refused to allow petitioner to take depreciation deductions in respect of grading and the tunnel bores themselves in Accounts 3 and 5, which have no ascertainable physical lives. In lieu of

depreciation deductions during the years here in issue, the Commissioner has allowed deductions for the retirement of petitioner's investment in grading and tunnel bores only in the year of actual retirement.

For the years beginning in 1959, petitioner has also been permitted to deduct ratable depreciation allowances in respect of its investment in railroad grading and tunnel bores themselves on about 1,000 miles of its coal branch lines pursuant to a closing agreement executed between the parties on April 20, 1967. These deductions have been computed with reference to the estimated useful lives of the coal reserves served by the affected lines. As a part of that closing agreement, petitioner agreed to refrain from claiming any depreciation with respect to its investment in grading and tunnel bores on those coal branch lines for any taxable year prior to 1968 except as provided in the closing agreement. For the purposes of this case, further references to grading and tunnel bores shall refer to only those portions of Accounts 3 and 5 for which depreciation deductions have not been allowed and which are not provided for in the coal branch line closing agreement.

Although petitioner's grading and tunnel bores, when properly maintained, are not ordinarily subject to physical exhaustion through use or otherwise, they have in the past been retired for a variety of other reasons which may collectively be termed obsolescence. Typically, obsolescence occurs as a result of either the physical inadequacy of the asset or the termination of service over the line on which it is located. For example, when excessive curvature in a line renders it inadequate for higher speeds or incompatible with new equipment, petitioner may relocate the tracks, resulting in the retirement of the existing grading. Likewise, with the addition of larger modern rolling stock, the clearance in at least one of petitioner's tunnels became inadequate, forcing its abandonment, and another such tunnel was retired after it caved in during its attempted enlargement. Although it is sometimes possible to enlarge a tunnel bore, the more usual remedy is to remove the roof and all of the earth covering the inadequate part of the tunnel or the whole tunnel, a procedure known as "daylighting." Alternatively, when the alignment of the tunnel is inadequate or when daylighting is infeasible, petitioner may "plug" the ends of the tunnel and relocate the roadway in a new tunnel or in an "open cut."

Insofar as retirements due to termination of service are concerned, these may occur not only when a line is completely abandoned due to loss of business but also when the traffic on a multiple track line is consolidated. For instance, the introduction of centralized traffic control, an electronic traffic signal system, has enabled it to operate trains in both directions on a single track. As a result, in at least two locations where it had earlier been necessary to have two separate tunnels, one to accommodate the eastbound traffic and one for the westbound traffic, petitioner has closed one of the tunnels and rerouted its former traffic through the remaining tunnel.

Other less frequent causes of grading and tunnel bore retirement include relocating trackage in switching yards, casualties, and condemnation by public authorities.

Of the 39 tunnels now or formerly in service on petitioner's main lines, 16 have been retired and 23 remain in service. In the case of 13 of those retired tunnels the old alignment was changed (i.e., there was a relocation to an open cut or to a new tunnel), and in the other three instances the old alignment was retained (i.e., the old tunnel was daylighted). As of December 31, 1972, petitioner's total, cumulative investment in tunnels (exclusive of coal branch lines and depreciable items) since 1850 was $6,335,262.75, as shown in Account 5. During that period $983,136.86 of that tunnel investment had been retired.[7]

Similarly, from the earliest date of petitioner's corporate records until December 31, 1972, petitioner's total, cumulative investment in grading (exclusive of coal branch lines and certain depreciable items such as retaining walls), as reflected in Account 3, was $88,019,613.35 of which $9,187,574.09 had been retired.

From its experience of retirements of both grading and tunnel bores it thus became apparent to petitioner by 1954 that neither asset possessed an unlimited useful life. Furthermore, the combined long-range economic and technological outlook in 1954, set forth above in the findings under the first issue herein, reinforced petitioner's conclusion that much of its grading, and perhaps its tunnels too, would eventually either be abandoned altogether or otherwise retired in order to permit reconstruction in accordance with the demands of new technology.

---

[7] In the cases of the three daylighted tunnels, the original cost of each tunnel was transferred from Account 5 to Account 3, as prescribed by the ICC Uniform System of Accounts. The amounts involved, however, do not appear in the record.

Although this prospect of major retirements of its grading and tunnel bores, when viewed alone, did not permit petitioner to predict reliably in 1954 the probable useful life of any one of its tunnels or segments of grading, it was possible through statistical methods of life analysis to make a reasonably acceptable estimate of the probable life of the average asset within a group of similar assets. From among the several methods of statistical life analysis, by 1954 the regulatory commissions of the various States generally had accepted the so-called actuarial or annual rate methods as the preferable procedure for predicting probable service lives.

The fundamental principle of the actuarial method is that groups of similar assets possess, on the average, similar service life, or survivorship, characteristics. The mechanics of an actuarial study require not only knowledge of the annual volume of additions to and retirements from the group of assets under study but also "aged data," that is, the age in years of each asset at the time of its retirement and the age of all the surviving assets. Such data may be stated in terms of units of property or in terms of dollars of investment. All of the units, both those retired and those surviving, are then assigned to the appropriate "age intervals," which commonly span a single year. The actuarial method seeks to determine the annual rate at which property was retired from each of these age intervals. This is done by relating the actual number of units retired from each age interval to the total number of units in the age interval, i.e., the maximum number of units which could have been retired, generally referred to as "exposures."

The relationship of retirements to exposures for any age interval can be expressed as a "survivor ratio," the ratio of units surviving to units exposed. The survivor ratio is used to compute the percentage of property in each age interval which survives until the beginning of the next age interval. This is done by multiplying the survivor ratio at age zero (that is, all property placed in service and hence 100 percent) by the survivor ratio for the first age interval, then multiplying that product by the survivor ratio for the second age interval, and so on through all age intervals for which data is available. Thus, for example, the number of all units initially placed in service (zero years old), or exposed to retirement in the first age interval, is compared to the number of units which in fact survived for an entire year. The

latter number comprises the numerator and the former the denominator of the survivor ratio for the first age interval. Then the number of units exposed to a second year of retirement, i.e., all those units surviving the first year, is compared to the number which survived their second year, yielding a survivor ratio for the second age interval. The result of multiplying the survivor ratio of each succeeding age interval is a sequence of percentages of all property under study which survived each age interval and remained on hand at the beginning of the next age interval. The resulting sequence of percentages can then be plotted on an axis, the abscissa of which represents the property age in years and the ordinate of which represents the percentage of all units surviving. The data, plotted as such and smoothed, form the observed survivor curve which is characteristic of the property group studied during the years for which data were available. The survivor curve spans a full maximum life cycle when the curve reaches zero percent surviving, indicating that the oldest property will have been retired. The typical complete survivor curve begins at 100 percent surviving for new property, declines slowly to indicate little retirement activity for young property, then declines more rapidly to reflect greater retirement, and finally declines slowly again as the long-lived older property is encountered. The survivor curve is simply a graphic measure of the average probable service life for the assets of that property group, computed by measuring the area under the survivor curve and dividing by a factor of 100. Additional actuarial studies for periods of less than the business' full history are useful comparative tools by which to determine the *trend* of the property group's average service life.

It frequently occurs when studying long-lived assets that the historical data available are insufficient to produce a complete *observed* survivor curve, one extending all the way from 100 percent to zero percent surviving. This is referred to as less than a complete life cycle. Because the derivation of the average probable service life depends upon the area below the survivor curve, though, it is nonetheless necessary to have a complete curve. This problem may be solved by extending the incomplete survivor curve, or "stub" curve, artificially.

One widely used technique by which this can be accomplished is that of matching the observed stub curve with one of the 18 sets of what are referred to as the Iowa curves. So called by reason

of the work in this area done at Iowa State College, these curves were developed on the premise that retirements of physical property follow general mathematical equations to an extent which permits the retirement of industrial properties to be classified into patterns. The 18 type curves developed at Iowa State are complete survivor curves, representing the distillation of detailed analyses of 176 actual survivor curves plotted from the complete life cycles of a wide range of physically exhausting industrial properties. Neither railroad grading nor tunnel bores, however, were among those assets studied. The resulting curves represent 18 different patterns of retirement distribution which can generally be anticipated for industrial property. Each of the 18 curves may be drawn to correspond to a wide range of average lives while retaining its characteristic retirement distribution.

Selection of the Iowa curve which best fits a "stub" survivor curve plotted from actual data can be done mathematically or, more commonly, visually. When an incomplete survivor curve developed from observed data is fitted to an Iowa curve, it is possible to conclude that the physical characteristics of the two curves, having largely coincided for the period during which retirements were observed, will continue to coincide as the property grows older. Upon that assumption, the average life determined for the complete Iowa curve may be taken to be the average life for the property group under study. The Iowa curve so selected thus may provide an indication of the property's average service life, based upon past retirement experience.

The strength of the actuarial method lies in its consideration of both the number and age of not only past retirements but also the units remaining in service. However, because the results of the actuarial method reflect all retirements for whatever cause, it is essential that in evaluating those results one ascertain the cause of past retirements and apply judgment as to whether they may be expected to continue in the future. Moreover, the reliability of the results may be adversely affected by the small size of the groups of property observed, infrequent observations of the property, or the retirement of a relatively large number of units for a very special cause. Irregular retirements are particularly troublesome when the study has been conducted in dollar units of investment rather than in units of property, the effect being that dollars of significantly different value may be

compared and cause the survivor curve to overstate or understate the property's probable life.

Mr. John J. Reilly, a recognized expert in this field, performed statistical life studies of the type described above in respect of petitioner's grading and tunnel bores. For this purpose he used dollar units of investment. Petitioner supplied the necessary aged data which, with respect to its tunnel bores, was complete from 1850; with respect to its grading, it was complete at least since 1919 and was reconstructed [8] on the basis of an ICC valuation for all years prior thereto during which the railroad or its predecessors were in existence. Mr. Reilly performed life analyses for several shorter and more recent experience time periods, as well as for the full history, in order to discover if an increasing or decreasing trend of average service life could be observed. Because the observed survivor curves in each case were incomplete, he used the Iowa curve technique in order to extend the stub curves. The results of his studies were as follows:

*Account 3-grading*

| Band of years | Average life (years) |
|---|---|
| 1874–1954 | 150 |
| 1900–1954 | 150 |
| 1924–1954 | 100 |
| 1934–1954 | 100 |
| 1955–1972 | 100 |

---

[8] Prior to 1914, most railroads, including petitioner and its predecessor companies, did not keep books showing the cost of individual items in their road property accounts. By reason of the Railroad Valuation Act of Mar. 1, 1913, 49 U.S.C. sec. 19a (1970), the ICC conducted an inventory and valuation of petitioner's property. The resulting report listed the properties by particular geographical sections called "valuation sections." For the purposes of providing aged data for the life studies conducted by Mr. Reilly, it was necessary to relate the engineering values determined by the ICC for each valuation section to actual years of construction for that valuation section. Through the use of corporate records it was possible in each instance to determine the actual date or dates of construction for each valuation section. This information was utilized in the following manner:

(1) The number of miles constructed in a given year was multiplied by the year of construction, yielding a product called "year-miles";

(2) All the year-miles were added to yield a sum called "total year-miles";

(3) Total year-miles were divided by the total number of miles within a valuation section to yield a quotient called "weighted average year of construction."

All of the engineering valuation costs for a particular valuation section were then allocated to the average year of construction.

*Account 5-tunnel bores*

| Band of years | Average life (years) |
|---|---|
| 1850–1954 | 85 |
| 1900–1954 | 75 |
| 1924–1954 | 60 |
| 1934–1954 | 60 |
| 1955–1972 | 90 |

It was Mr. Reilly's conclusion, based upon these studies as well as upon interviews with petitioner's financial and operating personnel and upon his personal observations of the physical property involved, that the average probable service lives of petitioner's grading and tunnel bores were as follows:

| Account | Average life |
|---|---|
| 3-Grading | 100 years |
| 5-Tunnel bores | 70 years |

The average age of petitioner's grading investment on hand in 1954 was 48.0 years; the average age of its tunnel bores investment was 38.3 years. From these figures, Mr. Reilly then determined the following average *remaining* life for those assets of each account which had been placed in service prior to December 31, 1954, adjusting for the fact that the shorter-lived property had already been retired:

| Account | Average remaining life |
|---|---|
| 3 | 60.0 years |
| 5 | 38.5 years |

In its petitions, petitioner has claimed overpayments of its Federal income taxes for each of the years here in issue on account of the Commissioner's failure to allow annual ratable depreciation deductions in respect of its grading and tunnel bores both of which, due to foreseeable obsolescence, had alleged determinable useful lives of not more than 50 years as of 1954.

OPINION

The issue before us here is quite different from that which we considered in respect of petitioner's track structure. Although they both relate to depreciation deductions, the similarity ends there. In the case of petitioner's track structure, the assets involved were admittedly depreciable, the question being one of *how* such deductions were to be computed. By contrast, with respect to petitioner's grading and tunnel bores we must decide *whether* they are depreciable assets, and if depreciable, *what* are

their established useful lives.[9]

The general rule governing depreciation is contained in section 167(a)(1), I.R.C. 1954, which provides:

SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, * * *

Neither grading nor tunnel bores, when properly maintained, are subject to physical exhaustion due to wear and tear. On the other hand, the Commissioner does not dispute that due to obsolescence these assets will at some time lose their usefulness to petitioner and be retired. The controversy here centers on what is essentially a factual inquiry, namely, do these assets have reasonably determinable useful lives, as required by the regulations, upon the basis of which may be computed a reasonable yearly allowance for depreciation. In particular the pertinent regulations provide as follows:

Sec. 1.167(a)-1. Depreciation in general.

(a) *Reasonable allowance.* Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property * * *

(b) *Useful life.* For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * *

---

[9] If these assets are depreciable, it is undisputed that the RRB method would be inapplicable and that depreciation deductions would be allowable ratably over their useful lives if such can be determined.

It is petitioner's position that the actuarial studies in respect of its past retirement experience in conjunction with its experts' prognoses of economic and technological developments relating to the railroad industry in general and to the C & O in particular enabled petitioner in 1954 to reasonably determine the useful lives of its grading and tunnel bores. On account of these factors, petitioner continues, it was foreseeable in 1954 that *on the average,* although not in each instance, this property would become obsolete in 50 years, and that it was therefore entitled to deduct an annual ratable allowance for depreciation during that period. The Commissioner responds by drawing a distinction between assets which are known not to survive forever and those which possess a reasonably determinable useful life. He argues both that the statistical life studies in this case are not sufficiently reliable and that the predictions of economic and technological developments to occur some 50 or more years hence are far too speculative to enable petitioner to make satisfactory estimates of the useful lives of these assets. While the matter is not free from doubt, we are persuaded that petitioner has established that both its grading and its tunnel bores do have reasonably ascertainable useful lives upon the basis of which it is entitled to deduct reasonable allowances for depreciation.

The right to deduct a "reasonable allowance" on account of the progressive exhaustion of a taxpayer's business property is intended "to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets." *Detroit Edison Co. v. Commissioner,* 319 U.S. 98, 101. To be more specific, "it is the primary purpose of depreciation accounting to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use * * * of the asset to the periods to which it contributes." *Massey Motors, Inc. v. United States,* 364 U.S. 92, 104. See *Hertz Corp. v. United States,* 364 U.S. 122, 126. Because the parties before us agree that the properties in question have useful lives of finite duration after which their values will be entirely exhausted, the critical threshold inquiry is whether petitioner has demonstrated with adequate proof that its claimed deductions on account thereof embody sufficiently "accurate estimation[s]" of their useful lives so as to render the resultant

allocations "meaningful." *Massey Motors, Inc. v. United States,* 364 U.S. at 104.

The difficulty of such a showing is compounded where, as here, the alleged exhaustion is wholly the result of obsolescence rather than physical deterioration. As explained by the Supreme Court in *U.S. Cartridge Co. v. United States,* 284 U.S. 511, 516:

Obsolescence may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory laws, and other things which, apart from physical deterioration, operate to cause plant elements or the plant as a whole to suffer diminution in value.

See also *Real Estate Title Co. v. United States,* 309 U.S. 13, 16. Unlike physical exhaustion through use which more readily lends itself to empirical study and follows more predictable patterns, exhaustion through obsolescence often defies observation while in progress, succumbing to certainty only in retrospect. This is in part a reflection of the fact that obsolescence is to some extent a function of managerial policy rather than a physical phenomenon. Yet it is clear that, by including obsolescence within the ambit of section 167, the statutory scheme which demands to know the useful life of property prior to its expiration is sufficiently flexible to accommodate some degree of uncertainty and its concomitant inaccuracy. This practical concession to reality was recognized early by the Supreme Court in construing the depreciation provision of the Revenue Act of 1918 (*Burnet v. Niagara Brewing Co.,* 282 U.S. 648, 654-655):

It would be unreasonable and violate that canon of construction to put upon the taxpayer the burden of proving to a reasonable certainty the existence and amount of obsolescence. Such weight of evidence as would reasonably support a verdict for a plaintiff in an ordinary action for the recovery of money fairly may be deemed sufficient. Neither the cost of obsolescence nor of accruing exhaustion, wear and tear that is properly chargeable in any period of time can be measured accurately. A *reasonable approximation* of the amount that fairly may be included in the accounts of any year is all that is required. [Emphasis supplied.]

The Court reached a similar conclusion in *United States v. Ludey,* 274 U.S. 295, 302, when it addressed itself to the analogous problem of determining the depletion allowance to which the taxpayer was entitled:

The fact that the [mineral] reserve is hidden from sight presents difficulties in making an estimate of the amount of the deposits. The actual quantity can rarely be measured. It must be approximated. And because the quantity

originally in the reserve is not actually known, the percentage of the whole withdrawn in any year, and hence the appropriate depletion charge, is necessarily a *rough estimate.* But Congress concluded, in the light of experience, that it was better to act upon a rough estimate than to ignore the fact of depletion. [Emphasis supplied.]

See also *Fribourg Navigation v. Commissioner,* 383 U.S. 272, 277; *Massey Motors, Inc. v. United States,* 364 U.S. 92, 104; *Detroit Edison Co. v. Commissioner,* 319 U.S. 98, 101; *Gambrinus Brewery Co. v. Anderson,* 282 U.S. 638, 645; *Becker v. Anheuser-Busch, Inc.,* 120 F. 2d 403, 416 (8th Cir.).

Without here addressing ourselves to the relative bearing of all of the considerable amount of evidence before us, we think, on the basis of the entire record, that the actuarial method of life analysis is, in the circumstances of this case, an acceptable means by which to extrapolate from petitioner's relevant experience with retirements. While we are acutely aware of the limitations of such a statistical approach as well as the critical importance of applying informed judgment to its results, we are nonetheless inclined to accept the explanations and conclusions of petitioner's highly qualified expert witnesses. Thus petitioner has presented a reasonable case, soundly based upon the 80 or more years of its carefully recorded retirement experience. And notwithstanding the borderline character of the reliability of an extrapolation in such circumstances we conclude, albeit without strong confidence, that the statistical studies of the sort presented here may form the basis for making acceptable predictions of future retirements. In so concluding, we are mindful that the risk of error is implicit in such projections, "but prediction is the very essence of depreciation accounting." *Massey Motors v. United States,* 364 U.S. 92, 105.

We are moved to resolve whatever doubts we have in this regard in favor of petitioner for two reasons. First, the Court of Claims in two virtually indistinguishable cases (*Pennsylvania Power & Light Co. v. United States,* 411 F. 2d 1300; *Virginia Electric & Power Co. v. United States,* 411 F. 2d 1314) relied upon comparable life analyses made by Mr. Reilly to allow depreciation deductions in respect of assets (easement rights-of-way) which had theretofore been regarded as nondepreciable. And second, the *Commissioner subsequently acquiesced* therein. Rev. Rul. 72-403, 1972-2 C.B. 102.

The plaintiff in each of those cases claimed depreciation deductions in respect of the cost of acquiring and clearing easement rights-of-way for powerlines, the only limit on their useful lives being abandonment. Although it was found that the life of such an easement was not coterminous with that of the attendant powerline, the Court concluded that the plaintiffs were entitled to depreciate their easement costs. In each of these cases John J. Reilly testified in behalf of the plaintiff. On the basis of statistical life analyses of the same type he submitted here, he was of the opinion that the properties there in issue had ascertainable useful service lives as determined by his studies. During his testimony in the present case, Mr. Reilly expressed the opinion that, because of the unusually complete data which petitioner had supplied and the relatively greater number of retirements which it had experienced, the asset lives here were *more* determinable than were those in the utility company cases. Of even greater significance, though, was the admission at trial by Frederick Bone, the Government's expert witness in this matter:

Q. And as I understand it, you've testified that the lives here are more determinable than the lives in the electric utility cases?
A. That's right.

It was the Court of Claims' opinion that:

Despite the impreciseness of taxpayer's estimates of useful lives, they are reasonable, and their application will result in spreading the recapture of the pertinent capital costs over the very substantial periods of time above-stated. The fact that taxpayer has not established a useful life for each of its easements and for each item of initial clearing costs, but rather a useful life for the mass properties in each of the pertinent accounts, does not detract from the reasonableness of its estimates. Some easements and initial clearing costs may survive, while others will terminate before the expiration of such estimated useful lives. The unreasonable conclusion would be to equate these easements and clearing costs to fee-owned land, presumed to last forever at a steadily appreciating value. As stated by the Supreme Court, if what now appears to be reasonable useful lives of such assets proves by further experience to be in error, administrative steps are readily available for a redetermination. [411 F. 2d at 1307.]

See also 411 F. 2d at 1317. The Commissioner has approved the result in the utility cases, cases addressing the identical issue which we now face, cases in which was presented exactly the type of statistical evidence now before us and by the very same expert witness, and cases in which the supporting factual data was conceded by the Government's expert witness to be weaker than

that in respect of the present case. We cannot find any meaningful differences in the Government's favor between those cases and the one before us, and we are satisfied that a like result is warranted here.[10]

Our conclusion in this respect is consistent, we think, with the enactment of Code section 185 [11] as part of the Tax Reform Act of 1969. Pub. L. 91-172, sec. 705(a), 83 Stat. 487, 672-673. By reason of section 185, railroad companies are now entitled to amortize over a 50-year period the cost of grading and tunnel bores which are first placed in service after 1968. Although the Commissioner would have us conclude from this that prior to 1969 such property was nondepreciable, this interpretation is not borne out by the relevant legislative history. The hypothesis upon which this section was enacted, and which it was designed to overcome, was that *because it was assumed that their useful lives could not be shown* grading and tunnel bores were not depreciable. Thus, the Senate Finance Committee, which introduced that provision, explained in its report (S. Rept. No. 91-552, 254 (1969)):

The committee amendments also provide railroads with the option to amortize railroad gradings and tunnel bores on the basis of a 50-year average life. Under present law, railroads capitalize these costs but have not been able to depreciate them because of uncertainties as to the length of their useful life.

---

[10] This conclusion, in our judgment, is also in accord with the Commissioner's position that tunnels of electric utilities, including the boring costs, are depreciable. Bulletin F 59 (1942 rev.); see generally, Rev. Proc. 62-21, 1962-2 C.B. 418 (Guidelines, group 1, class 3). These tunnels are, in all material respects, indistinguishable from those of petitioner here in issue.

[11] SEC. 185. AMORTIZATION OF RAILROAD GRADING AND TUNNEL BORES.

(a) GENERAL RULE.—In the case of a domestic common carrier by railroad, the taxpayer shall, at his election, be entitled to a deduction with respect to the amortization of the adjusted basis (for determining gain) of his qualified railroad grading and tunnel bores. The amortization deduction provided by this section with respect to such property shall be in lieu of any depreciation deduction, or other amortization deduction, with respect to such property for any taxable year to which the election applies.

(b) AMOUNT OF DEDUCTION.—

(1) IN GENERAL.—The deduction allowable under subsection (a) for any taxable year shall be an amount determined by amortizing ratably over a period of 50 years the adjusted basis (for determining gain) of the qualified railroad grading and tunnel bores of the taxpayer. Such 50-year period shall commence with the first taxable year for which an election under this section is effective.
* * *

(d) DEFINITIONS.—For purposes of this section—
* * *

(2) QUALIFIED RAILROAD GRADING AND TUNNEL BORES.—The term "qualified railroad grading and tunnel bores" means railroad grading and tunnel bores the original use of which commences after December 31, 1968.

See H. Rept. No. 91-782, 201-202 (1969). Where the railroad *has* been able to make the requisite showing of a reasonably determinable useful life, we are satisfied that Congress did not intend by its action to foreclose our consideration of this issue for grading and tunnel bores placed in service prior to 1969. Nor, on the other hand, is this legislation tantamount to a statutorily mandated 50-year useful life for such property.

Because we have decided that the useful lives of petitioner's grading and tunnel bores are reasonably determinable, we must now determine the length of those lives. Our confidence in the accuracy of petitioner's statistical forecasts is tempered somewhat, at least in the case of tunnel bores, by the very practical realization that by that reckoning the average useful service life of its tunnels in service in 1954 will expire around 1992, a scant 17 years from now. This we regard on the record before us as an unduly abbreviated life estimate, and one that calls for the application of judgment to the use of the Iowa curves.[12] Thus, based on the entire record as well as the foregoing consideration, we conclude and find as a fact that in 1954 petitioner's grading and tunnel bores had useful lives as follows:

| Account | Average useful life | Average remaining useful life of property in service in 1954 |
|---|---|---|
| 3-Grading | 100 | 60 |
| 5-Tunnel bores | 100 | 60 |

If in the future it becomes evident that these estimated lives have either understated or overstated the properties' actual useful lives, it is but a simple matter to adjust the balance of the depreciation schedule to compensate for the miscalculation. *Massey Motors, Inc. v. United States*, 364 U.S. 92, 105; sec. 1.167(a)-1(b), Income Tax Regs.

The decision we have reached here is based solely on the particular facts and circumstances of the record before us and is in no way intended to foreclose a different decision on the basis of a different record. Thus, while we recognize the possibility that the analytic means employed here, or some variant thereof, may be brought to bear theoretically in respect of some other class of

---

[12] As noted in our findings (*supra* at 374) an essential aspect of the Iowa curve technique is the application of judgment in respect of whether past retirements are of such character as to warrant the conclusion that they will continue in the future. And the record herein contains extensive evidence about the retirements of petitioner's tunnels that in fact occurred prior to 1954 which we have taken into account in making our finding.

business property, our decision here is not to be considered a binding precedent in connection with the applicability of life studies with respect to other types of property which have hitherto been regarded as nondepreciable assets. In particular we wish to correct any possible impression that by the result herein we have endorsed a general rule in respect of the depreciability of other railroads' grading and tunnel bores. That question must await resolution in light of the pertinent facts and circumstances of each taxpayer.

## Issue 3. Valuation of Relay Rail

### FINDINGS OF FACT

The useful life of railroad rail is limited by a variety of factors, the most important of which is the extent and nature of the impact of trains traveling on it. Because the rail is not entirely rigid as a train travels on the rail, the rail bends, sending a "wave" ahead of the wheels. As a consequence of this so-called "wave action" the rail suffers metal fatigue, a phenomenon similar to that encountered when one repeatedly bends a paperclip back and forth. As with a paperclip, excessive metal fatigue renders the rail brittle, causing it to snap. The rate at which rail succumbs to metal fatigue increases with the speed and weight of trains traveling on it as well as with the density of the traffic. In addition, the friction caused by the contact between the train wheel and the rail literally grinds the rail away. Although rail wear on a straight segment of track will ordinarily be a less significant cause of deterioration than metal fatigue, it is of considerably more importance on curved portions of the track. Centrifugal force drives the locomotive wheels into the outside rail, creating a "hunting" effect. Although the resultant abrasion is alleviated somewhat by the railroads' practice of banking or "superelevating" the outside rail on a curve and thereby more evenly distributing the train's weight between the two rails, this cannot equalize the pressure for every combination of train speed and weight. And because those factors vary with each train that negotiates a curve, both the high and the low rails on curves suffer extensive wear. This damage is compounded by the fact that train wheels are on a fixed axle and that as a consequence the outside wheel, which has farther to travel on a curve, tends to slip ahead, grinding the rail surface in the process.

Another influence on the life of rail is what the railroads refer to as "end batter," a phenomenon characterized by the jointed ends of rails becoming permanently depressed from the impact of the train wheels. Rail life may be further limited by the dents left at intervals in the rail by the impact of a steam engine locomotive with unbalanced weights on its drivers. In addition to impairing the quality of the ride possible on such rail, this pounding sometimes leaves the rail more conducive to the formation of cracks in the rail. However, the introduction of welded rail and the changeover from steam engines to the diesel locomotive are expected to reduce appreciably, if not eliminate, at least the problems arising from such causes. Petitioner first laid welded rail in quantity in 1961 and has now put in service about 1,200 miles of it. Also, petitioner completed its diesel changeover prior to 1961.

The useful life of rail is further circumscribed on account of latent defects in the metal itself. Thus, in addition to erosion, rails suffer from end chipping, pitting, and excessive wear from the joint bars. Some aspects of rail degradation, such as corrosion and pitting, are more a function of time than of use.

Because rail wear occurs most rapidly on its most heavily traveled lines, petitioner seeks to use its least worn rail on those lines. In order to accomplish this objective, petitioner has divided its entire road system into two categories, namely, new rail territory and relay rail territory. As its name suggests, the new rail territory is comprised of those high-speed, heavy tonnage lines, primarily main lines, on which petitioner lays virtually all of the new rail which it purchases. As a result of petitioner's policy of removing used rail from main line service well before it reaches the point of becoming hazardous, the rail released in the process of laying new rail retains serviceability for petitioner's branch lines which require a lesser quality rail due to their characteristically less demanding traffic. The used rail which petitioner can relay at a different location is referred to as "relay rail" and the track on which it is laid constitutes the relay rail territory. Relay rail may in turn be picked up and relaid a second time on the least stressed portions of petitioner's track, such as sidings and switchyards. Rail is thus cascaded in use until worn beyond further serviceability, at which time it is picked up and sold as scrap iron.

With but minor exceptions, petitioner derives all of its relay rail from its new rail territory, and it rarely places new rail in service in the relay territory. Based on its own experience in striking the optimal balance between the rail needs of its new rail and relay rail territories, petitioner's operating policy has been to replace rail in the new rail territory when it has carried 400 million gross tons (MGT) of traffic. On the average, relay rail suitable for a second relay is moved after it has carried about 560 MGT of traffic. Although the lives of individual rails may depend upon whether they are welded and can vary considerably according to the conditions of their use, the average maximum expectable life of petitioner's rail during the tax years reflects a capacity of about 600 MGT.

Of the rail removed from the new rail territory, approximately 10 percent of its mileage is lost on account of "cropping" the ends in preparation for reuse. When welded rail is relaid, however, cropping is not necessary. Another 10 percent is scrapped for other reasons such as excessive wear of the rail head or cracks in the rail. Thus, during the taxable years, about 80 percent of the original new rail was used for the first relay. However, when the rail on the first relay had served its purpose, only about 60 percent thereof became available for a second relay. Such 60 percent represents about 48 percent of the original new rail (i.e., 60 percent of 80 percent), which may be rounded off to 50 percent of the original new rail. For example, 100 miles of new rail frees 80 miles of first relay rail which itself yields roughly 50 miles of second relay rail. By cascading its rail in this manner petitioner is able to maintain the desired equilibrium between its new rail and relay rail.

Although railroads typically reuse their less worn rail to maintain their own plant, a small quantity of relay rail does find its way to market, and there are recognized dealers or brokers who are active in this market. The buyers generally consist of small short line railroads, industrial users, construction companies, and mine operators as well as dealers, and their demand for rail is relatively low and inelastic. If the railroads were to offer for sale all of their usable secondhand rail, it could not be absorbed by the market. Petitioner uses most of its relay rail in its own system, and does not sell such rail on the market generally; however, it does sell small quantities of rail to those of its customers, who, failing to obtain it elsewhere, need it for the

purpose of creating sidings to link them with the C & O track. Petitioner sells this rail, which has ordinarily sustained 500 MGT of usage, for 75 percent of new rail selling price. Representative averages of the industry between 1960 and 1971 indicate that the price of relay rail normally ranged between 50 and 60 percent of new. The bulk of these transactions however, involved rail of relatively light weight. Railroads release very little rail with a "pattern weight" (a term explained below) over 115 pounds; yet among the major railroads, rail of 130 pounds and more comprise over half of the rail relaid.

Although the market in relay rail is thin, the market in both new rail and scrap iron is well established. New rail is purchased at prices per ton, computed in accordance with its "pattern weight." Pattern weight is the weight per lineal yard of new rail. Thus, one might refer to 130-pound rail to identify rail having 130 pounds per yard when new regardless of the fact that at the time its actual weight might be less because of wear and corrosion. When rail has reached the point where it can be classified only as scrap, its actual weight is roughly 10 percent less than its pattern weight, and it is sold at prices per actual ton.

Petitioner accounts for its investment in rail under the RRB method. When rail is either replaced or retired, the ensuing deduction is decreased by the salvage value of the rail recovered. If the salvage value is overstated, an insufficient deduction results; if understated, the deduction becomes excessive. In most instances, assignment of an improper salvage value has no long-term significance, inasmuch as the value assigned to the rail becomes its basis. Thus, if the rail is subsequently sold for scrap, an unduly low basis will result in additional sales profit exactly equal to excessive portion of the RRB deduction. Or, if the rail is relaid replacing other rail in kind, a low basis will be reflected in a reduced RRB deduction in respect of such replacement thereby causing a "wash" with the earlier excessive deduction. When, however, used rail is relaid as an addition or betterment, all or some of its basis is capitalized, thereby suspending the offsetting effect for what may be very substantial periods of time.

In response to the problem of distortions resulting from apparent widespread improper deductions (based upon adjusted historical cost of the rail rather than its generally higher fair market value at the time) taken by the railroads in respect of relay rail salvage value in their use of the RRB method, the

Commissioner on May 8, 1967, issued Rev. Rul. 67-145, 1967-1 C.B. 54. That ruling required all railroads to value their recovered track materials, including rail, at their fair market value. However, it soon became apparent that practical considerations might render it virtually impossible to make such valuations for years ending prior to the issuance of Rev. Rul. 67-145, and the Commissioner thereupon issued Rev. Proc. 68-46, 1968-2 C.B. 961, to deal with the problem. The difficulties were described therein as follows (p. 962):

SEC. 2. BACKGROUND.

.03. The Internal Revenue Service recognizes that any adjustments to be made in accordance with Revenue Ruling 67-145, for taxable years that ended prior to May 8, 1967, present complex valuation and accounting problems. Appraisals are not practicable in the case of such reusable railroad track materials because much of such track materials have been reinstalled in track and inspections of such materials in later years would not accurately disclose their fair market values as of the time they were recovered. Identification of previously recorded entries on the books and records, and adjustments thereto, would involve a very difficult and burdensome task. To alleviate these problems, a simplified procedure for making necessary adjustments arising from the application of Revenue Ruling 67-145 is provided by this Revenue Procedure.

The solution to the problem was set forth in Rev. Proc. 68-46 as follows (pp. 962-963):

SEC. 3. DETERMINATIONS AND CONDITIONS

.01 For taxable years ended prior to May 8, 1967, instead of making fair market value determinations for such years of recovered track materials, taxpayers may determine the value of recovered reusable track materials at an amount equal to the average of the market price for such track materials new, and the market price for such track materials as scrap, as of the taxable year of recovery. Such computed average price will be accepted by the Internal Revenue Service as representing the fair market value of recovered reusable track materials for such taxable years.

.02 For income tax purposes, instead of recording the changes on the books and records for each prior year due to the redeterminations of the values of recovered reusable track materials taxpayers may include as one adjustment to taxable income for each taxable year, the difference between previously recorded values in the capital property accounts on the books and records, and the values recomputed under section 3.01 of this Revenue Procedure. The amount of such adjustment for each taxable year will then be taken into account ratably over a 20 year period in computing taxable income, commencing with, and including the year of adjustment. Previously recorded values in any of the accounts on the books and records would not be changed.

.03 Taxpayers who avail themselves of this Revenue Procedure shall be deemed to have agreed that no adjustments on the books and records shall be

made to the previously recorded values referred to in section 3.02 of this Procedure.

Thus, for years ending prior to May 8, 1967, the railroads were permitted to determine the salvage value of relay rail at an amount equal to the average of the market price for such rail new and the market price for such rail as scrap as of the taxable year. The valuation thus provided for may be expressed in terms of a formula as follows:

$$V = \frac{1}{2}(N-S) + S$$

where:

$V$ = value of relay rail
$N$ = price of new rail
$S$ = price of scrap rail

On the basis of Rev. Proc. 68-46, the Commissioner made gross upward adjustments in the value of petitioner's relay rail laid in capital additions and betterments during the years 1954 through 1963, the result of which was to reduce the corresponding replacement deductions to which petitioner was entitled in those years.

### OPINION

The final issue is merely one of valuation. Petitioner has accepted the Commissioner's position that fair market value is the proper measure of its relay rail's value for the purpose of computing deductions under the RRB method. See sec. 1.167(a)-1(c)(1), Income Tax Regs.; Rev. Rul. 67-145, 1967-1 C.B. 54. Cf. *Mo. Pacific R.R. Co. v. United States,* 497 F. 2d 1386 (Ct. Cl.); *Chicago, Burlington & Quincy R. Co. v. United States,* 455 F. 2d 993 (Ct. Cl.), reversed on another issue 412 U.S. 401. However, petitioner takes exception to the Commissioner's admittedly arbitrary formula for valuation upon the basis of which he determined the deficiencies herein. Although that formula was proposed in Rev. Proc. 68-46 in permissive terms only, the Commissioner insists here that it is to be treated as governing unless the petitioner establishes a different and more accurate measure of value. Petitioner has accepted that challenge, and has proposed a different valuation formula which, it contends, more exactly conforms to its actual experience with relay rail. Although petitioner concedes that the true value of relay rail exists somewhere within the range of prices between the price of rail

new and the price it would bring as scrap, petitioner insists that substantially more than half the useful life of its rail is consumed before it is relaid even a first time. More specifically, it argues that the only meaningful measure of rails' useful life is in units of MGT of traffic, not in years. By translating the average use of its rail at the time it is relaid into percentages of a 600-MGT life and then weighting the results to reflect the differing amounts of first and second relay rail actually employed, petitioner concludes that, on the average, its relay rail has only 23 percent of its life remaining at the time it is relaid, a figure which it rounds off to 20 percent. Therefore, argues petitioner, to be realistic, the Commissioner's formula should be adjusted downward from 50 percent to 20 percent of the price difference between new and scrap. Petitioner adds that one further refinement in the Commissioner's formula is required in order to account for rail weight loss due to wear. Because the Commissioner's formula arrives at the rail's scrap value by reference to its pattern weight rather than its actual weight by which it is in fact sold, the formula scrap value should be modified by a factor of .9 in recognition of the difference between its actual and pattern weights. Thus, petitioner proposes the following valuation formula:

$$V = 20\% \, (N - .9S) + .9S$$

The Commissioner responds to petitioner's principal argument in twofold fashion. First, he maintains that a 600-MGT useful life understates the truth, as a result of which petitioner's formula is also arbitrary and the Commissioner's formula is presumptively correct. Secondly, the Commissioner argues that the true test of fair market value is the price at which relay rail sales actually occur, not the disembodied MGT calculations relied on by petitioner. This, concludes the Commissioner, militates in favor of his formula, the results of which very nearly coincide with the 75 percent of new price at which petitioner sells a small portion of its relay rail.

Apart from petitioner's recommended .9 adjustment in respect of scrap to reflect actual weight rather than pattern weight—with which we agree—we think that the positions of both parties are faulty and that the correct factor in the formula as applied to petitioner lies somewhere in between petitioner's 20 or 23 percent and the Commissioner's 50 percent.

To be sure, the Commissioner's formula was applied in *Chicago, Burlington & Quincy R. Co. v. United States,* 455 F. 2d 993, 1010-1014 (Ct. Cl.), reversed on another issue 412 U.S. 401, and *Mo. Pacific R.R. Co. v. United States,* 497 F. 2d 1386, 1399-1401 (Ct. Cl.). But, by the very terms of Rev. Proc. 68-46, the Commissioner's formula is permissive (section 3.01: "taxpayers *may* determine the value of recovered reusable track materials at an amount equal to"), not mandatory. Moreover, respondent's counsel conceded at the trial that the two foregoing Court of Claims decisions do not preclude a taxpayer from relying upon a different formula that might more accurately fit the peculiar circumstances of its case, provided, of course, that the taxpayer presents evidence in support of its position. And petitioner herein has in fact endeavored to present evidence towards that end. However, although it has satisfied us that the Commissioner's 50-percent factor is too high as applied to it, we are left with a clear conviction on the record that its proffered 20- or 23-percent factor is too low.

As is the situation in virtually every valuation case, an elaborate discussion of the evidence and the relative weight of the various judgmental factors taken into account in reaching the final result is a fruitless exercise giving rise to a misleading inference that value is susceptible of determination with mathematical precision. In fact, it represents at most a practical judgment based upon all the materials that are properly before the Court. And significant among such materials in the record here is petitioner's evidence relating to rail life in terms of gross tonnage of freight, broken down into three parts: Original use, first relay, and second relay. This evidence was strong, and it satisfied us that the Commissioner's 50-percent factor was inappropriate as applied to petitioner. On the other hand, petitioner's position virtually ignores prices at which relay rail in fact was being sold. To be sure, the market was a thin one, and it couldn't possibly have absorbed all the relay rail if it were offered for sale. Yet, as we have recognized in our findings, it was a market in which dealers or brokers were active in the purchase and sale of relay rail. That evidence cannot be lightly brushed aside; it must be taken into account and given some effect, with due regard to the thinness of the market. Moreover, even if we were to limit ourselves to petitioner's evidence as to the "three lives" of its rails, our own computations, following a somewhat

different route from that taken by petitioner, would give us a starting point of about 25 percent, rather than the 23 or 20 percent urged by petitioner. However, as we have indicated, we think we must also take into account other evidence, particularly that relating to the prices at which relay rail was in fact being sold, noting at the same time that such sales generally involved the less desirable, lighter weight rails. Notwithstanding the thinness of the market, this is relevant evidence that cannot be ignored in the context of this case. Accordingly, upon consideration of the entire record it is our best judgment and we hereby find as a fact [13] that the fair market value of petitioner's relay rail is an amount arrived at by using a factor of 30 percent in the formula under consideration. That formula may thus be stated as follows:

$$V = .30 (N - .9S) + .9S$$

where

$V$ = fair market value of relay rail
$N$ = price of rail new
$S$ = price of rail for scrap based on pattern weight

A final word as to our disposition of this issue. Our finding as to value of relay rail is limited strictly to this railroad, based upon the evidence presented in this record. It is not intended to disapprove the Commissioner's formula in Rev. Proc. 68-46 as applied in other circumstances, or to lift the burden of proof on any other railroad to show that the Commissioner's formula is factually inapplicable to it,[14] or to strike down the permissive use of that formula in any case in accordance with the procedure set forth in Rev. Proc. 68-46. The revised formula which we approved above represents merely a translation into algebraic terms of a finding of fact as to value that we made in this case upon the basis of evidence presented in respect of this petitioner;

---

[13] Cf. *Michael Potson*, 22 T.C. 912, 929, affirmed sub nom. *Bodoglau v. Commissioner*, 230 F. 2d 336, 340-341 (7th Cir.); *David J. Pleason*, 22 T.C. 361, 371, affirmed 226 F. 2d 732, 734 (7th Cir.), certiorari denied 350 U.S. 1006; *Fall River Gas Appliance Co.*, 42 T.C. 850, 857, affirmed 349 F. 2d 515 (1st Cir.).

[14] Cf. *United States v. St. Louis - San Francisco Ry. Co.*, —— F. Supp. ——, —— (E.D. Mo. 1975), where the court pointedly referred to the fact that no evidence was there presented "to show that any other method of determining fair market value is superior to the one proposed by the Commissioner," and concluded that the method proposed by the Government (Rev. Proc. 68-46) "will not be upset without some evidence to rebut it."

it should not be regarded as a formula of general application to all railroads.

*Decisions will be entered under Rule 155.*