CRANE & CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Crane & Co. v. Commissioner
Docket No. 7309-73.
United States Tax Court
T.C. Memo 1976-371; 1976 Tax Ct. Memo LEXIS 30; 35 T.C.M. (CCH) 1686; T.C.M. (RIA) 760371; December 6, 1976, Filed J. Owen Todd, for the petitioner. Justin S. Holden, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following deficiencies in petitioner's Federal income tax: Year
Deficiency
1969
$49,763.02
1970
37,424.60
1971
37,499.28
After concessions, the sole issue remaining for decision is the fair market value as of December, 1968, of a certain man-made "reservoir" which was the *31 subject of a charitable gift at that time. The parties have filed a stipulation of facts with exhibits which is incorporated herein by this reference. Crane & Co., Inc. ("Crane"), is a Massachusetts corporation with its principal place of business in Dalton, Massachusetts. Crane and its subsidiary corporations filed consolidated corporation income tax returns for each of the taxable years 1969, 1970, and 1971 with the Director, North Atlantic Service Center, Andover, Massachusetts. Crane and one of its subsidiaries, Byron Weston Company, Inc. ("Byron Weston"), will sometimes hereinafter be referred to collectively as the petitioner. Ashmere Reservoir (the "reservoir"), also known as Ashmere Lake, is a man-made reservoir located in the towns of Hinsdale and Peru, in western Massachusetts. It was constructed by the Ashmere Reservoir Association (the "Association") which was created by a special act of the Massachusetts legislature in 1872 to provide a source of water power for manufacturing plants located in that area. Between approximately 1872 and 1882 the Association acquired all the farm land in the area up to a certain level of elevation and thereupon formed the reservoir *32 for the benefit of its member manufacturing plants by constructing a dam and flooding the land. The reservoir was fed by springs and streams, and the waters released from it flowed into the Housatonic River. A number of the plants went out of business over the years, leaving Crane and Byron Weston as the sole surviving members of the Association. By 1967, title to the reservoir was vested to the extent of a five-sevenths undivided interest in Crane, and to the extent of a two-sevenths undivided interest in Byron Weston. However, by about 1962 the reservoir had ceased to be used as a source of water power, but was nevertheless maintained by the Association, which allowed others to use it for recreational purposes and the municipality of Hinsdale to flush the Housatonic River of sewage by releasing water from the reservoir. Ashmere Reservoir is not, and never was, a "Great Pond" within the meaning of Mass. Gen. Laws chapter 131, section 1. Under Massachusetts law a man-made body of water is distinguished from a Great Pond which is defined to mean a lake or pond which in its natural state covers an area of 20 acres or more. [1] Access to and use of a Great Pond is open to the public, *33 except as otherwise provided by law. [2]
In December of 1968, the reservoir property owned by petitioner included: (1) an earthen dam, approximately 1,500 feet in length (and a spillway) covering an area of between 4.6 and 7.7 acres; (2) an area of land comprising the bed of the reservoir, consisting of between 247 and 299 acres, with between 6.6 and 6.7 miles of shoreline; (3) five islands in the reservoir consisting of between 28.5 and 37 acres. Aside from the islands and the land occupied by the dam, petitioner owned none of the land abutting the reservoir. In December, 1968, owners of property along the shorefront included, among others, four seasonal camps and a developed subdivision *34 known as "Skyview Grove". Among all of the riparian lots only 55 were improved with any "residences" (cottages or cabins) and these were used primarily as vacation or second homes. The remaining lots were vacant, and, in addition, some 40 percent of the shorefront area was in a raw, undivided state. The general area around the lake was substantially undeveloped in December, 1968. As indicated above, no part of the shorefront property, developed or undeveloped, was owned by petitioner. As to the islands, which were owned by petitioner, 18 persons leased from petitioner the right to use lots on three of them. Such lots were originally leased to employees of petitioner at an annual rental of $25. Vacation-type buildings or cabins were constructed on some of these lots by the lessees, ranging in value from several hundred dollars to some $8,000. After the 1968 gift here in issue the rent was raised to $84 a year, and in 1974 it was again raised to $240. None of the owners of riparian property surrounding the reservoir paid any rent or fee for use of the reservoir. Pontoosuc Lake, Onota Lake and Otis Reservoir are all bodies of water located in western Massachusetts. Each was *35 a natural lake (a "Great Pond" within the meaning of Mass. Gen. Laws Chapter 131, section 1) which had been dammed and enlarged by the abutting landowners with the authorization of the Commonwealth of Massachusetts. To the extent that the natural lake had been enlarged by means of a dam, the additional water areas did not have all the attributes of a Great Pond. Between 1967 and 1971, all three were sold by their private owners, the first to Berkshire County, Massachusetts, the second to Pittsfield, Massachusetts, and the third to the State itself. The following table summarizes certain information about these lakes and the sales: Sales Name
Size
Shoreline
Date of Sale
Price
Pontoosuc Lake
505 acres
3.6 miles
Jan. 31, 1968
$22,500
Onota Lake
665 acres
4.7 miles
Aug. 6, 1971
75,000
Otis Reservoir
998 acres
14.0 miles
Jan. 16, 1967
215,000 The record fails to show what portion of the acreage or shoreline is attributable to each of these bodies of water in its natural state as a Great Pond and what portion is attributable to increased dimensions resulting from manmade alterations. [3] Lake Ashmere and these three bodies of water *36 are all located in the same general area of western Massachusetts, and are suited to similar purposes. In December, 1968, petitioner donated and transferred to the Commonwealth of Massachusetts its entire interest (i.e., Crane's five-sevenths and Byron Weston's two-sevenths undivided interests) in the Ashmere Reservoir property, consisting of the dam, reservoir and islands. On its returns for the year ending December 31, 1968, petitioner claimed a charitable contributions deduction for the fair market value of such gift in the amount of $785,000, [4] part of which deduction was carried over and deducted in 1969, 1970 and 1971. In determining the deficiencies herein the Commissioner revised the value of that gift downward. [5]
*37 The only issue tried before us was the fair market value of Lake Ashmere (including the dam and the five islands) as of December, 1968. Petitioner presented the evidence of two expert witnesses who valued the property at $668,000 and $690,000, respectively, while the Government presented the evidence of an expert witness who valued the property at $163,500. The petitioner's witnesses premised their conclusions primarily upon assumed income that might be derived from the property through the ultimate sales or leases to riparian owners of the rights to use the water for recreational or other purposes, and by developing and selling lots on the islands. The respondent's witness relied primarily upon the sales of Pontoosuc Lake, Onota Lake and Otis Reservoir, as providing useful comparables in determining the fair market value of Lake Ashmere. We found serious flaws in the valuations of all three experts. As to petitioner's experts, the theory relating to the sale of water rights to riparian owners contemplated not the sale of such rights "at retail" to individual owners of the shorefront property, but rather a "wholesale" disposition of the entire "bundle of rights" to a promoter *38 or entity that would in turn undertake to exploit such rights by individual sales in a manner similar to that employed in promoting a condominium project. [6] However, in rendering an opinion as to what such "bundle of rights" could be sold for, we think that these experts seriously overestimated the market available to a potential promoter, as well as the length of time (in years) that would be required to resell the water rights at retail to individual riparian owners. A prospective purchaser of the entire "bundle of rights" would certainly weigh these considerations, and, in our judgment, would not have taken nearly as optimistic an approach as that assumed by petitioner's experts. Moreover, considering the hazards of such an enterprise, we think that these experts failed to give adequate weight to the entrepreneurial risks as well as the amount of profit that such a hypothetical promoter would expect to realize from the project in light of the risks involved. In our view these experts arrived at values for the water rights which appear to be highly excessive. Similarly, their values for the islands were unconvincing, taking into account not only the absence of utilities, water, *39 and sewage facilities, and the inaccessibility (as to at least some of the islands) except by boat, but also a realistic view as to the length of time that would be required to sell all of the lots after the islands had been subdivided. At the same time, we did not find the testimony of respondent's expert satisfactory, since he failed, in our view, to make appropriate adjustments for differences between the subject property and those involved in the three sales which he used as comparables, overlooking, interalia, the fact that each of them in its natural state was a Great Pond, and neglecting to give any weight to the presence or absence of islands. It would serve no useful purpose to make a detailed analysis of the testimony of all three experts and explain item by item the extent to which we agree or disagree with their analyses or assumptions. Valuation is not a precise science, and the ultimate conclusion to be reached is purely one of fact. Cf. Chesapeake & Ohio Ry. Co.,64 T.C. 352, 391, 392. *40 We have given close attention to all of the evidence and have made a careful study of the entire record, and it is our best judgment on the whole record that the fair market value of the entire Ashmere Lake (water area, dam and islands) as of the time of gift in December, 1968, was $225,000. We so find as a fact. The petitioner's charitable deductions in respect of the gift to the Commonwealth of Massachusetts may be computed accordingly. Decision will be entered under Rule 155. Footnotes
1. It was stated at the trial that a Great Pond is defined as a body of water which in its natural state was in excess of 10 acres. Although there is a basis for using the 10-acre figure (see Mass. Gen. Laws chapter 91, section 35), various statutory provisions indicate that the 20-acre figure is perhaps of greater significance. See Mass. Gen. Laws chapter 131, sections 1 and 45. ↩
2. Mass. Gen. Laws chapter 131, section 45. See also Mass. Gen. Laws chapter 91, sections 18A, 19 et seq., 35.↩
3. Also, in the case of Otis Reservoir the matter is further complicated by the fact that some 67 abutting owners had contractual rights in respect of access to the water.↩
4. Crane did not file a consolidated return for 1968, and the deduction for $785,000 was divided between Crane and Byron Weston in accordance with their interests. ↩
5. We have been unable to ascertain on this record the precise amount determined by him as the fair market value of the property at the time of gift. That amount probably could be derived from some photocopies of handwritten schedules attached to the copy of the Notice of Deficiency that is before us, but the quality of the photocopies is so poor that it frustrated our attempt to ascertain the amount.↩
6. Such assumed sale to a promoter or intermediate entity was explicitly articulated in the testimony of one of petitioner's two experts, and was at least implicit in the testimony of the other.↩