WILLIAM R. KNAPP and MARGARET M. KNAPP, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent JAMES G. KNAPP and ELAINE M. KNAPP, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Knapp v. Commissioner
Docket Nos. 9953-74, 9954-74, 9642-75, 9643-75.
United States Tax Court
T.C. Memo 1977-389; 1977 Tax Ct. Memo LEXIS 51; 36 T.C.M. (CCH) 1576; T.C.M. (RIA) 770389; November 9, 1977, Filed James E. Merritt and Thomas H. Steele, for the petitioners. William E. Saul, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The *52 Commissioner determined the following deficiencies in petitioners' joint Federal income taxes for the years 1970 through 1973: Docket No.
Petitioners
Year
Deficiency
9953-74
William R. and
1970
$ 12,293
Margaret M. Knapp
1971
15,239
9642-75
William R. and
1972
4,473
Margaret M. Knapp
1973
23,077
9954-74
James G. and
1970
19,259
Elaine M. Knapp
1971
19,938
9643-75
James G. and
1972
26,968
Elaine M. Knapp
1973
25,571 After a concession by the Commissioner, the only issue for our decision is the fair market value of certain undivided interests in a particular parcel of real estate located in San Jose, California, as of December 1970, 1971, 1972 and 1973. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, along with accompanying exhibits, is incorporated herein by this reference. Petitioners William R. Knapp and Margaret M. Knapp, husband and wife, resided in San Francisco, California, when they filed their petitions in this case. They filed their joint Federal income tax returns for 1970 and 1971 with the Internal Revenue Service Center in Ogden, Utah. They filed their joint Federal *53 income tax returns for 1972 and 1973 with the Internal Revenue Service Center in Fresno, California. Petitioners James G. Knapp and Elaine M. Knapp, husband and wife, resided in Atherton, California, when they filed their petitions in this case. They filed their joint Federal income tax returns for 1970 and 1971 with the Internal Revenue Service Center in Ogden, Utah. They filed their joint Federal income tax returns for 1972 and 1973 with the Internal Revenue Service Center in Fresno, California. For several years prior to 1970, William R. Knapp ("William") and James G. Knapp ("James") owned a parcel of land consisting of 457.16 acres in San Jose, Santa Clara County, California (the "subject property"). William and James each owned, as his separate property, an undivided one-half interest in the subject property as tenants in common. William and James first acquired an interest in the subject property in the late 1940's, when a partnership of which they were members acquired a one-half undivided interest in 452 acres of the property for approximately $10 per acre. A year later the partnership acquired the remaining one-half undivided interest in the 452 acres for $20 per *54 acre. Subsequently, the partnership acquired the remaining five acres [1] from the Pacific Gas and Electric Company for about $1,000. Prior to 1960, the partnership transferred to William and James, as tenants in common, the entire interest in the 457.16 acre subject property. The subject property is located in the northwest section of the city of San Jose, the county seat of Santa Clara County. It is situated approximately three miles northwest of the former town of Alviso. The property is irregular in shape, bounded on three sides by water: Guadalupe Slough on the west, the San Francisco Bay and Coyote Creek to the north, and easterly by the Alviso Slough. The salt evaporation ponds of Leslie Salt Company adjoin the southerly boundary. Its elevation is one foot above mean sea level, U.S.G.S. Datum, 1969, and is bounded by perimeter dikes. The dikes are approximately at the nine-foot elevation and were constructed by Leslie Salt Company. With the exception of ten acres used by the Knapps for a duck-hunting club, the land is under lease to Leslie Salt Company *55 as an evaporation pond. Apparently only five of the ten acres reserved for a duck club are actually utilized for club purposes. As of 1970, improvements situated on the five acres included a frame clubhouse, a well, pumping and storage tank and a fresh water lake with duck blinds. Surface soils are clay or silty clay and overlay alluvium soils. Bedrock is estimated at 1,200 feet. There is evidence of subsidence to the extent of three to four feet in the past 35 years. This is common in the south bay region with the greatest amount, about eight feet, occurring in the downtown area of San Jose. This subsidence problem together with silting of adjacent sloughs is one that could cause either salt or fresh water flooding. Periodic topping of the dikes, dredging of the sloughs, and water importation, which reduces well water demands, are remedies that could solve this problem. There are several parallel electric transmission towers and lines that traverse the property in a northeast direction. A separate line supplies electrical power to the clubhouse facilities. The subject property is typical of the land in the immediate vicinity. Present access is provided over four miles *56 of dikes owned and maintained by Leslie Salt Company. The roadway is the top of the dikes and begins near State Highway 237 at the entrance to Alviso. It is an unpaved road unsuitable for heavy trucks and continues into the northerly section of the property providing vehicular access to the clubhouse. Petitioners have an easement from Leslie Salt Company providing legal access to the subject property over the company's dikes. The easement is 20 feet wide.It is subject to termination by Leslie Salt Company provided, however, that Leslie Salt Company contemporaneously provide a comparable substitute easement and right of way for the benefit of the subject property. The right of way was granted exclusively for the benefit of the Knapps, their successors and assigns, for the use and enjoyment of their property by providing an access to the dwelling and other appurtenances situated on the subject property. On May 1, 1951, William and James, and others entered into a lease of the subject property to the Leslie Salt Company. The lease was to run for a period of 20 years, and provided for annual rent in the amount of $2,250. In addition, Leslie Salt Company agreed to pay all property *57 taxes on the subject property. The lessors retained the right to use an area not exceeding 10 acres for a private duck-hunting club. On November 12, 1969, William and James executed an agreement with Leslie Salt Company extending the term of the 1951 lease for a five-year period ending on April 30, 1976. [2] Under the terms of the lease, the lessors had the right to terminate upon six months' notice to Leslie Salt Company, subject to the proviso that the lessors would in case of such premature termination be required to pay Leslie Salt Company for dikes and other improvements placed on the property by Leslie Salt. However, upon termination of the lease in normal course at the end of its term, all improvements were to become the property of the lessors without any requirement of compensation therefor by the lessors. From 1951 and up to the time of the trial of this case, the bulk of the subject property was used by the Leslie Salt Company as salt evaporation ponds, and about 10 acres *58 were reserved by the Knapps for use in connection with a duck-hunting club. The subject property, however, as diked marshland bordering on San Francisco Bay, has long been of interest to Government planners and, more recently, has been subjected to governmental controls on use and development. A 1959 report published by the U.S. Army Corps of Engineers projected that the subject property would be used as salt ponds as late as the year 2020. As early as 1957, however, a Santa Clara County plan projected the subject property as part of a major industrial, residential and port development. In 1967, the City of San Jose published a plan for the development of a marina on the Guadalupe Slough in the vicinity of the subject property, with the possibility of residential development of the subject property in connection with the marina. In 1972 a study of the south San Francisco Bay area by the Santa Clara County Planning Policy Committee recommended that the subject property be left as open space because of the adverse effect that major filling operations would have on the ecology of the flood plain, but left open the possibility of recreational development of the property. Meanwhile, *59 plans were being developed to establish a San Francisco Bay National Wildlife Refuge under the auspices of the U.S. Department of the Interior's Fish and Wildlife Service. A report dated August 1974 proposes that the subject property be designated for "restricted use" because it represented "critical wildlife habitats which must be maintained without disturbance, with access only for management and research purposes." During the entire period from 1951 to the time of trial, the subject property was subject to zoning and other regulations by the County of Santa Clara, the town of Alviso and, after Alviso's incorporation into San Jose, the City of San Jose. In 1970-1973, the subject property was zoned M-1, light industrial, by the City of San Jose, which would have permitted development as a marina. Beginning in 1969, moreover, state and Federal agencies began to assert jurisdiction over the subject property and other properties in and around San Francisco Bay. On January 6, 1969, the San Francisco Bay Conservation and Development Commission ("BCDC") submitted a final report to the Governor of California and the Members of the California Legislature. Effective May 1970, the California *60 Legislature established BCDC as a permanent regulatory agency of the State, adopted the 1969 final report of the BCDC, and gave BCDC authority to control development of the San Francisco Bay, including diked marshlands such as the subject property, by requiring landowners to obtain a BCDC permit before altering the use of Bay properties. [3]
In 1974, the U.S. Army Corps of Engineers published regulations asserting jurisdiction to control development of diked *61 marshlands such as the subject property. The Corps of Engineers thereafter required landowners to obtain a permit from the Corps before filling any tidal lands or diked marshlands. William and James Knapp are both successful businessmen. Prior to his retirement in 1971, William was the general plant manager of the Falstaff Brewery in San Jose. James, at the time of trial, was Under Secretary of the Air Force. Both are life-long residents of the San Francisco area. William and James originally acquired the subject property for investment purposes. In particular, they believed that the City of San Jose might eventually desire the property for a deep-water or barge terminal port facility. In 1970, however, they reevaluated the desirability of retaining the subject property. In the first place, the property had been reassessed for property tax purposes, resulting in substantially higher property taxes. [4] Secondly, William was concerned that property taxes would be a strain on his post-retirement income should Leslie Salt Company terminate its lease. Thirdly, William and James were becoming concerned that retention of such a large, illiquid asset could cause problems for their *62 estates should anything happen to them. They also had large capital gains which they desired to offset. After consulting their attorneys, they decided to give the property to a charitable organization, and beginning in December 1970 they donated the following percentage interests in the subject property to the Nature Conservancy: Year
William
James
1970
4.75%
8.0 %
1971
2.3
3.22
1972
2.4
11.63
1973
10.94
10.94
*63 At the same time, both William and James altered their wills to make a bequest to the Nature Conservancy of any interest in the subject property owned by them at their deaths. The Nature Conservancy qualified as a publicly supported organization as described in section 170(b)(1)(A)(vi), I.R.C. 1954. Its stated objectives are - (a) to preserve or aid in the preservation of all types of wild nature, including natural areas, features, objects, flora and fauna, and biotic communities; (b) to establish nature reserves or other protected areas to be used for scientific, educational, and other esthetic purposes; (c) to promote the conservation and proper use of our natural resources; (d) to engage in or promote the study of plant and animal communities and of other phases of ecology, natural history, and conservation; (e) to promote education in the fields of nature preservation and conservation; and (f) to cooperate with other organizations having similar or related objectives. The Nature Conservancy may hold land it receives to preserve such land as reserves or it may sell property it receives in order to obtain funds to be used to further its purposes. It accepts gifts even *64 though the property donated may be sold to raise funds. In connection with the preparation of their income tax returns for each of the years in issue, the Knapps employed Mr. Jack Kidder, a qualified expert appraiser, to value the subject property. Mr. Kidder determined that the subject property had the following values on the following dates: Date
Total Value
Value per Acre
Dec. 1970
$1,142,900
$2,500
Dec. 1971
1,085,750
2,375
Dec. 1972
914,320
2,000
Dec. 1973
914,320
2,000 At trial, Mr. Kidder testified that he was still of the opinion that his original valuations were correct. At trial, the Knapps presented the testimony of Mr. David Ingram, a qualified expert appraiser. Mr. Ingram stated that in his opinion the subject property was worth $2,500 per acre in each of the four years here in issue. The Commissioner, in his notice of deficiency, determined that the subject property was worth no more than $1,000 per acre in any of the years 1970-1973. At trial, the Commissioner presented the testimony of Mr. Eugene Brodd, a qualified expert appraiser. Mr. Brodd testified that in his opinion the subject property had the following values on the *65 following dates: Date
Total Value
Value per Acre
Dec. 1970
$571,450
$1,250.00
Dec. 1971
514,305
1,125.00
Dec. 1972
514,305
1,125.00
Dec. 1973
462,875
1,012.50 The Commissioner has conceded that the subject property was worth at least the amounts stated by Mr. Brodd.[5]
The three expert appraisers who testified at trial, and whose appraisal reports were submitted in evidence, agreed that the proper method for valuing the subject property is the comparable sales method. Mr. Kidder chose 12 sales for comparison purposes. Six were located in Alameda County, five in Santa Clara County, and one in Sonoma County. The dates of sales ranged from 1957 to 1969, *66 and the prices per acre from $799 to $5,679. Mr. Ingram selected 38 sales for comparison, 18 in Santa Clara County, 11 in San Mateo County, and 9 in Alameda County. Prices per acre ranged from below $1,000 to above $20,000, and dates of sales from 1963 to 1976. Mr. Brodd chose seven sales in Santa Clara County, seven in Alameda County, and three in San Mateo County. The sales took place between 1957 and 1975, at prices from $800 per acre to more than $12,000 per acre. Mr. Kidder and Mr. Ingram were asked to, and did, state a value only for the subject property as a whole. Mr. Brodd determined a value per acre for the entire property for 1970. For 1971 and 1972, however, he reduced the per acre value by 10 percent (and in 1973, 20 percent) to reflect the fact that the Knapps did not, in those years, own the entire interest in the subject property, and that a prospective purchaser would take into account the fact that the Nature Conservancy was a cotenant of the property. None of the three appraisers took into account, in their appraisal reports, the possibility that the undivided interests actually donated by the Knapps to the Nature Conservancy should be valued at less than *67 their proportionate share of the total value of the subject property because of the fact that they were minority interests. At trial, Mr. Ingram testified that he thought a minority undivided interest in the subject property would be difficult to sell, and that he would advise a client against buying such an interest. While he did not explicitly so state, a fair inference from his testimony is that a discount would probably be required in order to sell such an interest. Mr. Brodd also indicated that a minority undivided interest would have to sell at a discount. On the basis of Mr. Kidder's appraisals, the petitioners claimed on their income tax returns for the years 1970 through 1973 that the fair market value of the subject property was $2,500 per acre in 1970, $2,375 per acre in 1971, and $2,000 per acre in 1972 and 1973. Each deducted in each year the same percentage of the subject property's total value as the percentage undivided interest which he had given to the Nature Conservancy (subject to the percentage limitations on charitable contributions contained in section 170, I.R.C. 1954). For example, in 1970 William contributed a 4.75 percent undivided interest, and claimed *68 a charitable contributions deduction (before limitations) equal to 4.75 percent of the total claimed fair market value of the subject property for December 1970.At trial, petitioners claimed that the fair market value of the subject property was $2,500 per acre in each of the four years, and sought to increase their charitable contributions deductions accordingly. The Commissioner, in his notices of deficiency, disallowed the petitioners' claimed charitable contributions deductions to the extent that they were based upon valuations of the subject property in excess of $1,000 per acre. OPINION The only issue presented by this case is the fair market value of certain undivided interests in a certain parcel of real estate (the "subject property") located in the city of San Jose, county of Santa Clara, California. Prior to December 1970, petitioners William R. Knapp and James G. Knapp, two brothers, were the owners of a 457.16 acre tract of diked marshlands bordering the extreme southern end of San Francisco Bay. The land was under longterm lease to the Leslie Salt Company, which used it as salt evaporation ponds except for 10 acres which the Knapps had reserved for use as a *69 duck-hunting club. In December 1970, and in December of each of the following three years, each of the brothers donated to the Nature Conservancy, a charitable organization contributions to which are deductible under section 170, I.R.C. 1954, the following undivided interests in the subject property: Year
William
James
1970
4.75%
8.0%
1971
2.3
3.22
1972
2.4
11.63
1973
10.94
10.94
Each of the two claimed charitable contributions deductions on the basis of these gifts. In their original income tax returns for the years 1970-1973, the Knapps claimed that the subject property had fair market values as follows: Fair Market Value Date
Fair Market Value
per Acre
Dec. 1970
$1,142,900
$2,500
Dec. 1971
1,085,750
2,375
Dec. 1972
914,320
2,000
Dec. 1973
914,320
2,000
At trial, the Knapps claimed that the subject property had a value of $2,500 per acre in each of the three years at issue. The Knapps claimed annual charitable contributions deductions (before limitations imposed by section 170) in amounts calculated by applying the percentage of the undivided interest donated in each year to the total fair market value *70 of the subject property in that year. In his notices of deficiency, the Commissioner disallowed petitioners' claimed charitable contributions deductions to the extent that they were based upon fair market values of the subject property in excess of $1,000 per acre. At trial, the Commissioner conceded that the subject property as a whole had at least the following fair market values: Fair Market Value Date
Fair Market Value
per Acre
Dec. 1970
$ 571,450
$ 1,250
Dec. 1971
514,305
1,125
Dec. 1972
514,305
1,125
Dec. 1973
462,875
1,012.50
The Commissioner asserted, however, that the value of the gifts should be discounted to reflect the fact that each gift was of a minority undivided interest in the entire property. Three expert appraisers were presented as witnesses at the trial. Each testified that the comparable sales method was the appropriate method of valuing the subject property. Mr. Kidder, petitioners' first witness, valued the subject property at $2,500 per acre in December 1970 and at $2,375, $2,000, and $2,000 per acre in December of each of the three succeeding years. Mr. Ingram, petitioners' second witness, valued the subject *71 property at $2,500 per acre in each of the four years. Mr. Brodd, the Commissioner's only witness, valued the property as a whole at $1,250 per acre in each of the four years, but applied discounts of 10 percent in 1971 and 1972, and 20 percent in 1973, to reflect the fact that, in the later years, petitioners did not own the entire interest in the property and that a prospective purchaser would take into consideration the cotenancy of the Nature Conservancy. It would serve no useful purpose to make a detailed analysis of the testimony of all three experts and explain item by item the extent to which we agree or disagree with their analyses. Valuation is not a precise science, and the ultimate conclusion to be reached is purely one of fact. Cf. Chesapeake & Ohio Ry. Co. v. Commissioner,64 T.C. 352, 391, 392. Each of the three experts considered a substantial number of allegedly comparable sales, and took into consideration such differentiating factors as location, access, size of parcel, physical characteristics and potential for development. All three were aware of, and sought to take into account, the various legal controls exercised by the Bay Conservation *72 and Development Commission ("BCDC"), the U.S. Army Corps of Engineers, and county and local governments. In general, we think that the fair market value of the property as a whole during all the years involved was closer to petitioners' claim of $2,500 an acre than to the values now relied upon by the Commissioner. We are concerned, however, that neither petitioners nor petitioners' expert witnesses took into consideration, in valuing the interests actually transferred to the Nature Conservancy, the fact that minority undivided interests in real property might sell at discounts below their allocable portion of the value of the entire property. Cf., e.g., Estate of Fawcett v. Commissioner,64 T.C. 889, 898-901; Estate of Campanari v. Commissioner,5 T.C. 488, 492-493; Stewart v. Commissioner,31 B.T.A. 201, 204-206; but cf. Baer v. Commissioner,3 B.T.A. 881, 883. Nor did petitioners or their expert witnesses give adequate consideration to the possibility that a prospective purchaser might also discount the price of an interest in the subject property because of the fact that the Nature Conservancy was a cotenant *73 in each of the years after 1970, thereby possibly limiting the use to which the property could be put. [6] We have given close attention to all of the evidence and have made a careful study of the entire record; it is our best judgment on the whole record, and we so find as a fact, that the fair market values of the undivided interests in the subject property which petitioners donated to the Nature Conservancy were as follows: Fair Market Value per Acre
of Minority Undivided In- Year
terest in Subject Property
1970
$2,100
1971
1,975
1972
1,975
1973
1,975
*74 In order to permit calculation of the allowable charitable deductions, and to reflect a concession by the Commissioner, Decisions will be entered under Rule 155. Footnotes
1. The parties have stipulated a total acreage of 457.16 acres, and have not explained the.16 acre discrepancy.↩
2. On December 29, 1975, William and James, the Nature Conservancy, and Leslie Salt Company entered into an agreement extending the term of the lease for a two-year period ending on April 30, 1978.↩
3. The 1969 BCDC San Francisco Bay Plan makes several references to the subject property and surrounding properties. The notes to Plan Map 7 suggest that these areas may be included in the proposed National Wildlife Refuge, which would be consistent with the Bay Plan, and/or may be suitable for limited recreational development. In the Supplement to the Bay Plan, it is stated that a San Jose barge terminal but not a deep-water port could be a desirable development, but there is no indication that the subject property would be a likely site. The Supplement also mentions San Jose's Guadalupe Slough marina plan but concludes that residential development of the subject and surrounding properties should not be encouraged.↩
4. In 1970, the Knapps received notice from the County Assessor of Santa Clara County that the property tax assessment on the subject property had increased from approximately $10,000 in the previous year to $18,160.98 for the year 1970. The increase in property tax was due solely to an increase in the assessed value assigned to the subject property. The assessed value of the subject property as of March 1, 1970, was $142,520 for land and $22,520 for improvements, for a total of $165,040. The County Assessor determined that the full cash value or fair market value of the subject property as of that date was $660,160, or approximately $1,247 per acre for the land and $1,444 per acre for the land and improvements. In 1971 the assessment was reduced and the taxes dropped back to approximately $10,000.Taxes were about $11,000 in 1972 and $14,000 in 1973.↩
5. In his appraisal report, Mr. Brodd determined that the fair market value of the Knapps' undivided interest in the subject property (or a lesser undivided interest in the subject property) was no more than $1,125 per acre in 1971 and 1972, and no more than $1,012.50 per acre in 1973, because of the cotenancy of the Nature Conservancy in those years. He appeared to assume that the fair market value of the entire↩ subject property would have been $1,250 in each of the years 1970-1973.
6. Petitioners did make the argument, in respect of both the minority interest and Nature Conservancy aspects of the case, that California law provides procedures for the severance of undivided interests in real property. See California Code of Civil Procedure sections 752, etseq., Stats. 1943, c. 892, p. 2737 (repealed 1976); California Code of Civil Procedure sections 872.010, etseq↩. (West. Supp. 1977). We have given some weight to this argument, but we are persuaded that a prospective purchaser would nonetheless refuse to pay the full aliquot portion of the entire value of the property for an undivided minority interest therein, because of the procedural burdens, possible delays and costs involved in severance proceedings, and because of the lack of certainty as to just what portion of the property would be awarded to each party upon severance. Our ultimate conclusion in this respect is reinforced by Mr. Ingram's testimony that a minority undivided interest in the property would be difficult to sell and that he would advise a client against buying such an interest.